**STATE of Texas and City of Austin, Appellants,**

v.

**Robert M. SCHMIDT and Richard A. Massman, Co–Trustees of the Leon A. Schmidt Children's Trust Number One, Appellees.**

**No. 3–90–154–CV.**

Court of Appeals of Texas, Austin.

Feb. 13, 1991.

Rehearing Overruled April 3, 1991.

James Noble Johnson, Asst. City Atty., Austin, for appellants.

Stephen I. Adler, Barron & Adler, Austin, for appellees.

Before CARROLL, C.J., and POWERS and JONES, JJ.

POWERS, Justice.

In a statutory-condemnation action, the State of Texas and the City of Austin recovered title to a small part of a tract of land owned by Robert M. Schmidt and Richard A. Massman. The trial-court judgment awarded Schmidt and Massman a sum equal to the stipulated market value of the part taken ($7,559.00) plus the depreciation in value of the remainder as found by the jury ($74,880.00). Tex.Prop.Code Ann. § 21.042(b), (c) (1984). The State and the City appeal. We will affirm the judgment.

We refer hereafter to the litigants as Schmidt and the City, omitting any mention of the State and Massman merely for convenience and clarity.

## THE CONTROVERSY

Schmidt's parcel adjoins 75 feet of the east right-of-way line of U.S. Highway 183 in Austin. Two tenants operate businesses in a building near the rear of Schmidt's parcel. The area is devoted to commercial uses. An appended drawing illustrates the general circumstances surrounding the controversy. At the present time, motor vehicles may travel rather directly between Schmidt's parcel and the existing traffic lanes of Highway 183.

The City intends, however, to convert Highway 183 to a controlled-access highway. To eliminate grade crossings, the City will raise the main traffic lanes about 37 feet. These elevated lanes will connect at intervals to ramps. The ramps will connect in turn to parallel frontage roads on either side, and by them to the general system of public streets in Austin. After completion of the project, Schmidt's parcel will adjoin one of the frontage roads. Motor vehicles on the main traffic lanes will then have only indirect passage, via the frontage roads and ramps, to and from Schmidt's tract.

Because of certain federal regulations, the planned conversion of Highway 183 to a controlled-access highway cannot be accomplished unless the existing right-of-way is widened by approximately six feet where it adjoins Schmidt's parcel. To acquire this narrow strip across the front of Schmidt's tract, the City initiated a statutory-condemnation proceeding under Chapter 21 of the Texas Property Code. As indicated in the appended drawing, no structures or parking spaces lie within the narrow strip.

After a hearing, the special commissioners awarded only the market value of the narrow strip in the sum of $7,559.00. Objections having been taken to their award, a trial de novo followed in the county court at law. The parties stipulated that $7,559.00 was the market value of the narrow strip to be acquired by the City. The trial proceeded on Schmidt's claim for injury to the remainder of his tract.

At the conclusion of the evidence, the jury were asked to find the amount of any decrease in the fair market value of the remainder, immediately after the condemnation, considering all of the uses to which the narrow strip will or may be put. They answered $74,880.00. In its final judg-

ment, the court awarded Schmidt that sum together with the stipulated amount of $7,559.00. The City challenges on appeal the $74,880.00 awarded as damages for injury to the remainder.

The City contends we must reverse the trial-court judgment because that court erroneously admitted evidence of the following: (1) the completed project will require an increased "circuity of travel" between the main traffic lanes and Schmidt's tract; (2) raising the main traffic lanes will divert traffic from the streets and roads serving the Schmidt property at ground level; (3) elevating the main traffic lanes will make Schmidt's tract less visible from the main traffic lanes; and (4) construction activities associated with the project will interfere with the use of Schmidt's tract during the lengthy period of construction.[1]

The City argues that the four factors are not "property" within the meaning of either the condemnation statutes (Tex.Prop. Code Ann. §§ 21.001–.065 (1984 & Supp. 1991)) or the constitutional guarantee that an owner's "property" shall not be taken, damaged, destroyed, or appropriated for public use without compensation (Tex. Const.Ann. art. I, § 17 (1984)). Consequently, the City argues, no compensation can be awarded for the four items, and the evidence showing them was inadmissible because it was irrelevant as a matter of law after the parties agreed upon the fair market value of the narrow strip, the only "property" acquired by the City in its condemnation action.

We will set out below the particulars of the City's argument. We observe here, however, that the argument mixes indiscriminately the rules which govern two distinctly different elements of a condemnation action: (1) the substantive rules applicable to a determination of whether the owner has a legal right to compensation; and (2) the substantive and evidentiary rules applicable to a calculation of the owner's compensation once he has established a legal right to it. *See City of Austin v. Teague*, 570 S.W.2d 389, 394 (Tex.1978); *City of Abilene v. Downs*, 367 S.W.2d 153, 160 (Tex.1963). We shall unmix them in the discussion that follows.

## AN OWNER'S LEGAL RIGHT TO COMPENSATION

■ An owner acquires a legal right to compensation when he sustains a legal injury respecting his "property." Under the condemnation statutes, this occurs when a condemnor acquires title to the whole or a part of the owner's "property." (§ 21.-012(b)(1), §§ 21.042–.062). Under the Texas Constitution, this occurs when the owner's "property" is taken, damaged, destroyed, or appropriated for public use (art. 1, § 17).

■ The "property" susceptible to condemnation, under the statutes and the constitution, embraces "every estate or use in the land capable of segregation and ownership such as incorporeal hereditaments and other rights and privileges incidental to the land and necessary to a complete title." Rayburn, Texas Law of Condemnation § 48(4), at 136 (1960). *See Houston North Shore Ry. Co. v. Tyrrell*, 128 Tex. 248, 98 S.W.2d 786, 793 (1936); *McInnis v. Brown County Water Improvement Dist. No. 1*, 41 S.W.2d 741, 744 (Tex.Civ.App.1931, writ ref'd); Moody, *Condemnation of Land for Highway or Expressway*, 33 Texas L.Rev. 357, 362–67 (1955). Because "property" includes, for condemnation purposes, incorporeal property, in addition to tangible property, the former kinds of property are susceptible to legal injury and a corresponding

---

**1.** The parties dispute whether evidence of each of the four factors was actually introduced at trial. Schmidt contends that no evidence was given regarding "circuity of travel" and "diversion of traffic volume." Hence, he contends, we need not consider on appeal whether such evidence was admissible.

It is perhaps true, as Schmidt contends, that the evidence pertains expressly to two factors only: (1) a decreased visibility of the Schmidt tract, because of the elevation of the main traffic lanes; and (2) an impairment in the use of his tract during the course of the prolonged construction activities. Nevertheless, from our understanding of the record, some evidence more or less implies the other two factors—"circuity of travel" and "diversion of traffic volume." For purposes of discussion, in any case, we will assume with the City that the evidence pertained to all four factors.

legal right to compensation in a condemnation action. *See, e.g., Teague,* 570 S.W.2d at 394 (right of lawful "development"); *State v. Meyer,* 403 S.W.2d 366 (Tex.1966) (right of "access" to public streets); *Downs,* 367 S.W.2d 153 (right to use and enjoyment free of "nuisance"); *City of Amarillo v. Stockton,* 158 Tex. 275, 310 S.W.2d 737 (1958) (right to "lateral support"); *McGee Irrigating Ditch Co. v. Hudson,* 85 Tex. 587, 22 S.W. 967 (1893) ("riparian" right to take water). As pointed out below, however, not every incident of land ownership rises to the dignity of "incorporeal property." The term "incorporeal property" includes only those incidents of land ownership which the law *does* recognize as legally enforceable rights or choses in action.

In a statutory-condemnation action, the condemnor's petition may expressly claim or deny an intention to acquire certain incorporeal property, or the parties may dispute whether incorporeal property is necessarily encompassed in the taking of the owner's physical land under the facts and circumstances of the particular case. *See, e.g., State v. Frost,* 456 S.W.2d 245, 256 (Tex.Civ.App.1970, writ ref'd n.r.e.) and *State v. Meyers,* 292 S.W.2d 933, 936 (Tex. Civ.App.1956, writ ref'd n.r.e.) (right of "access" to public streets).

In an inverse-condemnation action, the owner may sue for compensation on allegations that his incorporeal property has in fact been taken, damaged, destroyed, or appropriated for public use. *See, e.g., City of Austin v. Avenue Corp.,* 704 S.W.2d 11 (Tex.1986) (right of "access" to public streets). To establish his legal right to compensation, however, the owner must first establish two subsidiary propositions: (1) that his affected interest is indeed incorporeal property, or a legally recognized and enforceable right or chose in action; and (2) that such property has, by the defendant's actions, been taken, damaged, destroyed, or appropriated for public use. McNamara, *Inverse Condemnation: A Sophistic "Miltonian" Bog,* 31 Baylor L.Rev. 443 (1979).

An owner of land may establish that, in yet another way, he has sustained a legal injury respecting his "property," giving rise to a corresponding legal right to compensation for the injury. Such an injury may occur when the actions taken by a public authority, within its own property limits, subject the owner's adjoining land to an additional servitude, charge, or burden—the nuisance in *Downs,* for example. More to the point in the present case, such an effect may occur because of actions taken by a public authority within the physical right-of-way through which its road passes. Having once acquired the right-of-way, a public authority may ordinarily raise or otherwise alter the road without thereby violating any legal right held by the owner of adjoining land, even though this may seriously diminish the attractiveness of the adjoining land and interfere with the owner's convenience and use of it, thus reducing its value. *State v. Brewer,* 141 Tex. 1, 169 S.W.2d 468 (1943). The theory of this general rule of non-liability rests upon the premise that such changes were reasonably foreseeable when the right-of-way was originally acquired, at which time the right to compensation was necessarily determined for all time. But the general rule of non-liability does *not* apply when the public authority cannot accomplish the improvement or alteration within the original right-of-way, and must acquire additional strips of the owner's adjoining land to accommodate the project. In those instances, the "proper test" for determining the issue of legal injury and right to compensation "is whether the newly acquired right-of-way imposes burdens on the abutting property which did not exist under the old right-of-way." *Milam County v. Akers,* 181 S.W.2d 719, 722 (Tex. Civ.App.1944, writ ref'd w.o.m.). Moreover, "an additional burden or servitude" *is* imposed as a matter of law when "construction is not feasible or is impractical upon the old right-of-way, and the new acquisition is essential to it." *Id.* When this is the case, as it is here, acquisition of the additional strips of land through condemnation creates in the owner a legal right to compensation for any reduction in

the value of his remaining property. *Id.* In a similar way, an owner who purchases his land in reliance on a dedication of adjoining land for park purposes may acquire a legal right to compensation for a loss of market value when the dedication is changed to permit the construction of a ramp leading to an elevated bridge. *State v. Clark*, 161 Tex. 10, 336 S.W.2d 612 (1960).

The theory of the City's argument in the present case is as follows: The four factors did not amount to incorporeal property taken or damaged by the planned conversion of the road to a controlled-access highway. The City concedes that a landowner has an incorporeal-property right denominated the right of "access," or the right of passage between his tract and the public streets. But under the applicable law, the threshold of that property interest is a "material and substantial" interference with such passage, determinable as a matter of law; and when the interference amounts merely to a greater "circuity of travel" no legal right to compensation arises in the owner. Such is the case here because, under the undisputed evidence, Schmidt's tract will open onto the new frontage road from which passage may be had to and from the city streets and the main traffic lanes of the elevated highway. As a matter of law, therefore, Schmidt was not injured in his property right of "access." *State v. Wood Oil Distributing, Inc.*, 751 S.W.2d 863 (Tex.1988); *City of San Antonio v. Olivares*, 505 S.W.2d 526 (Tex.1974); *City of Waco v. Texland Corporation*, 446 S.W.2d 1 (Tex.1969); *City of Beaumont v. Marks*, 443 S.W.2d 253 (Tex.1969); *City of Houston v. Fox*, 444 S.W.2d 591 (Tex.1969); *DuPuy v. City of Waco*, 396 S.W.2d 103 (Tex. 1965); *Archenhold Automobile Supply Co. v. City of Waco*, 396 S.W.2d 111 (Tex. 1965); *State v. Baker Bros. Nursery*, 366 S.W.2d 212 (Tex.1963); *L–M–S, Inc. v. Blackwell*, 149 Tex. 348, 233 S.W.2d 286 (1950).

The City argues next that no landowner has an incorporeal-property right in the volume of traffic which passes customarily in the street abutting his business property, and, under the applicable law, a public authority may reduce that volume by traffic controls or an alteration of a road or a street network without incurring any liability to the owner when his business patronage suffers as a result. The City relies on the following cases in support of its argument: *Fox*, 444 S.W.2d at 593; *Pennysavers Oil Company v. State*, 334 S.W.2d 546, 549 (Tex.Civ.App.1960, writ ref'd). Indeed, business losses are not compensable at all under the condemnation statutes and the constitution. *State v. Travis*, 722 S.W.2d 698 (Tex.1987), cert. denied, 484 U.S. 818, 108 S.Ct. 74, 98 L.Ed.2d 37; *State v. Zaruba*, 418 S.W.2d 499, 502 (Tex.1967); *City of Dallas v. Priolo*, 150 Tex. 423, 242 S.W.2d 176, 179 (1951). Therefore, the City contends, the conversion of the highway to a controlled-access highway—the rerouting of traffic, the elevation of the main traffic lanes bearing the greater traffic volume, and the obscuring of Schmidt's tract by that elevation—did not injure Schmidt in any right of property which the law recognizes and enforces.

Finally, the City argues that a landowner has no incorporeal-property right to be free of the annoyance and inconvenience of ordinary construction occurring within the public right-of-way when these do not rise to the level of a nuisance. These adverse consequences are not peculiar to the owner but are those of the community in general. Consequently, the City asserts, the owner has no legal right to recover compensation for them. The City cites *Ft. Worth Improvement Dist. No. 1 v. City of Ft. Worth*, 106 Tex. 148, 158 S.W. 164 (1913); *G., C., & S.F. Ry. Co. v. Fuller*, 63 Tex. 467 (1885); *City of Dallas v. Lawler*, 287 S.W. 137 (Tex.Civ.App.1926, writ ref'd.); *Hall v. Wilbarger County*, 37 S.W.2d 1041 (Tex.Civ.App.1931) *aff'd.* 55 S.W.2d 797 (Tex.Comm.App.1932).

■ The rules of law argued by the City are unassailable in the abstract, but they demolish claims and theories that Schmidt never advanced in the case by pleading or evidence. Schmidt did not claim a legal right to compensation on a theory that his incorporeal property had been taken or damaged in the condemna-

tion, *i.e.*, his property right of "access" or any other incorporeal-property right one might infer from the four factors. Schmidt claimed, instead, a legal right to compensation for an injury sustained by him in his *physical property alone*—the parcel of land remaining in his ownership after the taking of the narrow strip. He claimed this legal right on two indisputable grounds: (1) the statutory right, given in § 21.042(c), which entitles an owner to recover for any injury resulting from a taking of a part of his property by condemnation, expressly including any adverse *"effect of the condemnation on the value of [his] remaining property"*; and (2) the common-law right, described and applied in *Akers*, 181 S.W.2d at 722, which entitles an owner to recover for any injury resulting from a taking of a part of his property, including a reduction in the market value of his remaining property, when the taking is essential to accommodate a public project within an adjoining right-of-way.

The authorities cited in the City's argument are thus irrelevant, for they deal with *whether* a particular incident of land ownership was indeed, as the owner claimed, incorporeal property—a legal right that the law recognized and enforced as a right of "property."[2] Schmidt's evidence was not

adduced on that theory, and that is not the proper context in which to determine the admissibility of his evidence. Rather, he adduced evidence of the four factors to explain the basis for opinion testimony given by his expert witnesses that the market value of his remaining property had been reduced. The theory of such evidence was that these four factors would enter into the considerations of a willing buyer and willing seller attempting to negotiate a price for the remaining property. This is the proper context in which to consider the admissibility of Schmidt's evidence, and to that we now turn.

## CALCULATION OF AN OWNER'S COMPENSATION

We start with this bedrock principle: "The objective of the judicial process under the constitution and statutes is to make the landowner whole and to award him only what he could have obtained for his land in a free market." *City of Fort Worth v. Corbin*, 504 S.W.2d 828, 831 (Tex.1974).

 The basic substantive rules are set out in § 21.042. For land actually acquired by the condemnor, whether the whole or a part of a tract, the owner is entitled to the fair market value of the land. § 21.042(b).

---

**2.** The decision in *State v. Baker Bros. Nursery*, 366 S.W.2d 212 (Tex.1963), is an exception. There the court approved the trial court's pretrial suppression of evidence of any circuity of travel occasioned by the conversion of a road to a controlled-access highway, and any reference by counsel or evidence concerning the direction of the flow of travel upon the new highway. *Baker Bros. Nursery*, 366 S.W.2d at 214. The court noted that the case was not one "where all access to the new highway was denied, but a case where each remaining tract had access to the highway through the frontage roads alongside and parallel to the highway." *Id.* This was said in connection with a claim that the market value of the remainder was reduced by the project. The case is directly in point in the present case. Shall it control? We believe not for the following reasons.

The opinion in *Baker Bros. Nursery* omits to mention the Supreme Court's earlier indication that such evidence *would* be admissible in a statutory-condemnation action, as distinguished from an inverse-condemnation action. *State Highway Commission v. Humphreys*, 58 S.W.2d 144, 146 (Tex.Civ.App.1933, writ ref'd); *City of*

*San Antonio v. Pigeonhole Parking of Texas*, 158 Tex. 318, 311 S.W.2d 218, 219 (1958). More importantly, however, *Baker Bros. Nursery* was no more than an aberration, a temporary diversion, as the Supreme Court developed the precise limits of the incorporeal-property right of "access"; and, following *Baker Bros. Nursery* the "court firmly re established that existing access *is* a property right that cannot be taken, damaged, or destroyed without adequate compensation, *particularly* in a" statutory-condemnation action. Rayburn, *Legal Rights and Legal Fictions in Condemnation*, 10 Hous.L.Rev. 251, 255 (1973) (emphasis added). As noted by the author, the right was reestablished in *State v. Meyer*, 403 S.W.2d 366 (Tex.1966), to be refined subsequently by decisions arriving ultimately at the "substantially impaired" test suggested in Stoebuck, *The Property Right of Access Versus the Power of Eminent Domain*, 47 Texas L.Rev. 733 (1969). Rayburn, *supra*, at 254–56. This is essentially the test applied, of course, in *Avenue Corp.*, 704 S.W.2d 11.

In effect, the principle of *Baker Bros. Nursery* has been overruled by implication in the several Supreme Court decisions leading up to *Avenue Corp.*

The fair market value of the narrow strip was fixed by the parties' stipulation at $7,559.00. We need not refer to it further.

██ When a condemnation action severs an owner's land by the condemnor's acquisition of only a part of it, the owner may be entitled to an additional sum to compensate for any resulting injury sustained by him. To determine whether there is an injury, the fact finder must estimate from the evidence the extent of any "injury and benefit to the property owner" resulting from the condemnation, "including the *effect of the condemnation on the value of [his] remaining property.*" § 21.042(c) (Emphasis added).

In arriving at these two estimates, the fact finder may include in its consideration any "injury or benefit that is peculiar to the property owner and that relates to [his] *ownership, use,* or *enjoyment* of" his remaining property; however, the fact finder must exclude from consideration any "injury or benefit that the property owner experiences in common with the general community." § 21.042(d) (Emphasis added).

Section 21.041 declares certain categories of evidence to be admissible "[a]s the basis for assessing actual damages" under the foregoing substantive rules for calculating compensation. The categories refer to evidence showing (1) the value of the land taken, (2) the injury to the owner, (3) the benefit to his remaining property, and (4) the use of the property for the purpose of the condemnation.

It is readily apparent that the terms of §§ 21.041 and 21.042 are quite general in their reference to such things as "injury," "benefit," "ownership, use, or enjoyment," and the "effect of the condemnation on the value of [the] remaining property." Not surprisingly, these terms have been the subjects of judicial interpretation on more than a few occasions.

The key interpretations and distinctions were set out explicitly, after careful analysis, in *State v. Carpenter,* 126 Tex. 604, 89 S.W.2d 194 (1936). We shall mention only those applicable here.

1. The ultimate question is "one of proof as to market value and depreciation in market value, rather than to abstract questions as to what may or may not be considered by the jury in assessing damages." *Carpenter,* 89 S.W.2d at 199. "Market value" is defined ordinarily in terms of what the land would bring in a transaction between a willing seller and a willing buyer. *City of Austin v. Cannizzo,* 153 Tex. 324, 267 S.W.2d 808, 812 (1954); *Carpenter,* 89 S.W.2d at 201–202.

2. In general, "it is proper as touching the matter of the value and depreciation in value to admit evidence upon all such matters as suitability and adaptability, surroundings, *conditions before and after,* and *all* circumstances which tend to increase or diminish the present market value." *Carpenter,* 89 S.W.2d at 200 (Emphasis added). The extremely broad scope of admissible evidence implied by this language has been repeatedly reaffirmed in reference to the "test" of what a willing seller and willing buyer would consider in arriving at a negotiated price for the property. *See, e.g., State v. Schaefer,* 530 S.W.2d 813, 816–17 (Tex.1975) ("In the willing seller-willing buyer test of market value it is frequently said that all factors should be considered which would reasonably be given weight in negotiations between a seller and a buyer.") (citing *Cannizzo,* 267 S.W.2d at 814); *Corbin,* 504 S.W.2d at 830 ("In determining the landowner's just compensation for what is taken from him, the fact finder is entitled to consider every factor affecting the price which the prudent and willing buyer and seller would exchange for the property."); *City of Pearland v. Alexander,* 483 S.W.2d 244, 246 (Tex.1972) ("[I]t is proper to admit evidence upon all matters which tend to increase or diminish the present market value."); *Sample v. Tennessee Gas Transmission Co.,* 151 Tex. 401, 251 S.W.2d 221, 224 (1952) (In proving value, the court should admit "everything which has a bearing on the value of the property."); *Brazos River Conservation and Reclam. Dist. v. Costello,* 169 S.W.2d 977, 986 (Tex.Civ.App. 1943, writ ref'd w.o.m.) ("In order to enable the jury to determine the depreciation of

the remainder, the parties have the right to introduce evidence of everything which would tend to affect the value of the land in the estimation of a proposed purchaser or would tend to make it more or less valuable to the present owner."). The scope of admissible evidence is qualified, however, by the following rule from *Carpenter.*

3. "Evidence should be excluded [when it relates] to remote, speculative, and conjectural uses, as well as injuries, which are not reflected in the present market value of the property." *Carpenter*, 89 S.W.2d at 200; *see also Teague*, 570 S.W.2d at 395 (adverse effects of condemnation must be reasonably certain as opposed to mere possibilities); *Spindor v. Lo–Vaca Gathering Company*, 529 S.W.2d 63, 65 (Tex.1975) (recovery may be had in condemnation proceedings for injuries to the remainder which are reasonably foreseeable at the time of condemnation); *Heddin v. Delhi Gas Pipeline Company*, 522 S.W.2d 886, 888 (Tex.1975) (reduction in market value of remainder, attributable to fear in minds of buying public, may be shown when fear results from actual danger or when fear is otherwise reasonable); *Alexander*, 483 S.W.2d at 246–47 (constitution requires compensation only for probable future injuries affecting market value); *Texas Electric Service Company v. Campbell*, 161 Tex. 77, 336 S.W.2d 742, 744–45 (1960) (injuries that are mere possibilities are not compensable). Application of the rule to conjectural uses is illustrated in *State v. Walker*, 441 S.W.2d 168 (Tex.1969), in which the court held that any reduction in the market value of the remainder must be determined in reference to the actual use made of the property at the time of condemnation, as opposed to a hypothetical "highest and best use" that may or may not be made of the remainder in the future. The rule against remote, speculative, and conjectural injuries applies particularly to lost business profits, as illustrated by the distinctions drawn under the next rule from *Carpenter.*

4. "If the [expert] witness answers that there has been a depreciation or an enhancement in the market value after the taking, in either event it is proper to question him as to the basis of his opinion and the matters he has taken into consideration in arriving at his opinion." *Carpenter*, 89 S.W.2d at 201. This is, of course, a familiar aspect of examining and cross-examining any expert witness as to his opinion. But the rule involves an important distinction. In *Priolo*, the expert witness was asked to give his opinion concerning the effect of a partial taking upon the *business* which was conducted on the owner's remainder. The Court noted that his answer would have been admissible had he been asked his opinion concerning the effect of a partial taking upon the *market value of the remainder*. But the Court held the trial court properly excluded his answer because the question inquired explicitly about the effect of the partial taking upon the *business and injuries to business*, and such injuries are not compensable under the condemnation statutes:

> "The theory upon which the hypothetical question was propounded to the witness ... was not to establish one of the factors in estimating the value of the part remaining, but was to establish a separate and independent item of recovery."

*Priolo*, 242 S.W.2d at 179. The same distinction was applied in *Travis*, 722 S.W.2d at 698–99, and *Zaruba*, 418 S.W.2d at 503.

5. "If [the expert witness] should testify that among the things he has considered in arriving at his opinion of market value were 'community' benefits or injuries, but that there were other things of a legitimate nature which influenced his opinion, this should not invalidate his evidence altogether." *Carpenter*, 89 S.W.2d at 201. The Court preceded this rule by noting "that a trial court in the admission and exclusion of evidence cannot eliminate all evidence of 'community' benefits and injuries as touching questions of value and depreciation in value"; consequently, it was better, as the court concluded, to handle those matters by instructions and by the framing of queries submitted to the jury. *Id.*

It remains then to apply these rules in the present case. The City complains of the admission of evidence showing the four factors. The witnesses cited these factors in explanation of their opinions that the partial taking reduced the market value of Schmidt's remainder: each factor would enter into the minds of a willing buyer and willing seller attempting to arrive at a negotiated price. We cannot say that these four factors would not, as a matter of law, be considered by willing buyers and sellers. The evidence was not adduced in a way to imply that Schmidt claimed a legal right to recover compensation for the four factors *as such*, as occurred in *Priolo*. Instead, the evidence was adduced in a manner expressly authorized by *Priolo*—to show the factors that a willing buyer and willing seller would consider in arriving at an agreed price for the remainder, given its present use as commercial rental property.[3]

We believe, therefore, that the trial court did not err in admitting the evidence. We are bound so to hold by the explicit statements in *Carpenter, Schaefer, Corbin, Alexander, Sample,* and *Cannizzo,* declaring in effect that the scope of admissible evidence is coextensive with the factors that would reasonably bear upon the negotiations between a willing buyer and willing seller in reaching an agreed price for the property. Any other holding would be contrary to those decisions.[4] The City's contention that such evidence was inadmissible is actually a rather naked attack upon the solidly established rule that market value may be defined in terms of the willing buyer-willing seller "test." We are not free to disregard that rule.

The wide scope of admissible evidence, under *Carpenter* and the other authorities, is of course qualified by the corollary that evidence is not admissible when it pertains to uses and injuries that are only speculative, conjectural, or remote. But nothing in the present record suggests that any of the four factors were of that character.

Concerning the effect construction activities would have upon the market value of Schmidt's tract during the period of construction, we concede it is difficult to classify any particular injury as "community" or "special." *See* Kendall, *Special and Community Damages—A Confusion in Definition,* 10 Hous.L.Rev. 282, 289–90

---

3. For example, Schmidt's witness Jack Holford, a "development consultant," testified as follows concerning the factors that a prospective retail tenant would consider in deciding whether to lease space in a building:

 [If the tenants are] looking for a free-standing retail site, one of the first things they're going to look for is the traffic counts along the roadway where they're looking.... They're going to try to find a location—that location, wherever they find it, needs to have access from that street or road so that you can get into and out of the property. You need to be visible. Obviously, the tract of land has to be seen and visible, and the building is going to be placed there to be in such a manner that it can be seen.

 \* \* \* \* \* \*

 So all of those criteria go into making up what a potential tenant—a potential purchaser of a site, or tenant of a site, would want to have in order to have a stand-alone retail type of business.

 Schmidt's witness Larry Beard, a real-estate appraiser, testified that the best way to estimate the market value of a commercial tract such as the Schmidt property was to use the "income approach," or an estimate based on the rental income the property would generate.

4. Referring to the Supreme Court opinions in *Carpenter, Sample,* and *Cannizzo,* and similar opinions, Rayburn wrote as follows:

 These opinions, generation after generation, have shown that in condemnation cases we are dealing with elements of value and elements of damage and that any fact (yes, even circuity of travel to and from property) that makes the remaining land less valuable, or any fact that benefits or makes it more valuable, is and should be admissible on trial.... So long as we continue to measure the damages or value of remainder land by its before and after market value, by the willing seller-willing buyer concept, which is purely an economic one, then it is inescapable that good access or bad access, a high or low traffic count, a good central location or a poor inaccessible location, utilities or no utilities, corner or no corner, one-way or two-way traffic, and no access or impaired access have been and always will be economic factors that a buyer or seller will take into monetary account when they go into the market place to buy or sell. Location is the keystone and soul of the economics of market value of lands that are the subject of property ownership....

 Rayburn, *supra,* at 259.

(1973). We refer, however, to the warning in *Carpenter* that it is impractical to exclude such evidence on an item-by-item basis, but prejudice to the condemnor may be avoided by instructions and by proper framing of queries submitted to the jury. In the present case, the evidence regarding such activities was mixed with the other factors mentioned above, and the latter were proper to be considered by the jury. We therefore hold the trial court did not err in admitting the evidence regarding the effect of the construction activities.

We are not unmindful that testimony may be framed artfully to come within what *Carpenter* and the other decisions hold admissible. We observe, however, that the reality of any effect upon the market value of the landowner's property remains open to contrary evidence and argument.

In determining the legal issue of admissibility, moreover, it is not our concern that the payment of compensation may be expensive, even prohibitively so, to the condemnor. The issue of what level of expense is acceptable in connection with public works is a matter placed exclusively in the legislative and executive departments of government. Rayburn, *Condemnation—Legal Rights and Legal Fictions*, 10 Hous.L.Rev. 251, 260 (1973). And in any event, the condemnor is free to reverse its decision to acquire the property, following a trial which fixes the amount of compensation payable, so long as the owner is made whole in connection with the condemnor's decision to dismiss its statutory-condemnation action, as provided in § 21.019.

Finding no reversible error as assigned, we affirm the trial-court judgment.

Existing R.O.W.

6' strip

Parking

75'

N

U.S. HIGHWAY 183

Fairfield Drive

Existing R.O.W.