ALL AMERICAN PIPELINE
COMPANY, Appellant,

v.

Charles H. AMMERMAN and Wife,
Lois Ammerman, Appellees.

No. 3-89-259-CV.

Court of Appeals of Texas,
Austin.

Aug. 14, 1991.

Bill Bachus, Tarver, Bachus & Blythe, Temple, for appellant.

Mark M. Humble, Cameron, for appellees.

Before POWER, ABOUSSIE and KIDD, JJ.

KIDD, Justice.

Appellant, All American Pipeline Company ("All American"), initiated condemnation proceedings against property owned by appellees, Charles and Lois Ammerman ("the Ammermans"). All American sought to obtain a right-of-way easement through the residential portion of the Ammermans' 139.5-acre tract of land located in Milam

County, Texas. The Ammermans contested the special commissioners' award of $11,760 in damages. In a non-jury trial, the district court awarded the Ammermans the sum of $75,588.75 in damages. All American appeals this judgment. We affirm the judgment of the district court.

## THE CONTROVERSY

All American filed a petition in condemnation by which it sought to condemn a portion of the Ammermans' property for the construction and maintenance of a heated crude-oil pipeline. All American sought a right of way consisting of a fifty-foot wide, 2.23–acre permanent easement through the residential portion of a 139.5–acre tract of land owned by the Ammermans. All American also sought an additional fifty-foot wide, 2.23–acre temporary construction easement that would adjoin the permanent easement. The total acreage to be included in both easements was 4.46 acres.

The district judge appointed special commissioners to hear the case. The special commissioners awarded the Ammermans $11,760 in damages. The Ammermans objected to the commissioners' award and appealed to the district court. The case was tried to the court. The Ammermans adduced testimony from two expert witnesses who testified to the diminished value of the property. All American also presented testimony from an expert witness. The trial court awarded the Ammermans $75,588.75 for the reduction in market value of the property caused by the condemnation and pipeline construction.

All American appeals the trial court's award of damages. All American argues in a single point of error that the evidence adduced at trial was legally and factually insufficient to support the trial court's judgment.

## THE EVIDENCE

In reviewing a "no evidence" challenge, we consider only the evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, support the court's finding. *Stafford v.* *Stafford*, 726 S.W.2d 14, 16 (Tex.1987); *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 593 (Tex.1986). Any probative evidence supporting the finding will be sufficient to overrule the point of error. Calvert, *"No Evidence" and "Insufficient Evidence Points of Error"*, 38 Texas L.Rev. 361, 364 (1960). *See also* Powers and Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence"*, 69 Texas L.Rev. 515, 522 (1991).

All American's "insufficient evidence" challenge will be sustained only if, after reviewing the entire record, the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986).

The Ammermans presented testimony from three witnesses: Lois Ammerman and expert witnesses G.D. Fleming and Judy Matula. All American presented testimony from Albert N. Allen, its expert witness. We will review in detail the testimony adduced from each witness in order to determine whether the trial court's judgment is sufficiently supported by the evidence.

### 1. Lois Ammerman

Mrs. Ammerman testified that she and her family had lived in a house on the tract in question since they purchased the property in 1979. The Ammermans had improved the property in recent years by adding an addition to the house, a heating system, a garage, a deck, a barn, horse stalls, and by making other miscellaneous improvements. The Ammermans spent a total of $75,000 improving the property. Mrs. Ammerman stated that the property was best used as a home for her family.

Mrs. Ammerman testified that the proposed pipeline would run between their home and a nearby equipment shed. She stated that the distance between the house and garage area and the proposed pipeline was about thirty yards. Thus, because the family members walk between their home and the equipment shed many times daily, Mrs. Ammerman testified that she would be "literally living on top of" the pipeline.

## 2. G.D. Fleming

G.D. Fleming testified that he was a real-estate broker in Milam County. He had also been a banker and a real-estate appraiser for a lending institution. Mr. Fleming testified that he examined the Ammermans' property and found it to be well maintained and in near-excellent condition. He calculated the fair market value of the property before the condemnation to be $159,800, and the fair market value of the property after the condemnation to be $95,880. Thus, Mr. Fleming concluded that a willing buyer would pay a willing seller $63,920 less for the property after the condemnation than before.

Mr. Fleming testified that the only reason for the major depreciation in the value of the property was the close proximity of the pipeline to the living quarters. He stated that the garage of the residence was approximately thirty yards, or ninety feet, from the center line of the pipeline. He also testified that, before the condemnation, the highest and best use of the property was as a residence and small farming ranch. He stated that, after the condemnation, the highest and best use of the property would be agricultural. He felt that he had an obligation to inform a prospective buyer of the existence of the pipeline next to the house. It was his expert opinion that, after talking to other residents in the community, potential buyers "wouldn't have it at any price as a residence."

## 3. Judy Matula

Judy Matula testified that she had been a licensed real-estate agent in Milam County for over ten years. She stated that she had inspected the Ammermans' property on two occasions. It was her opinion that a willing buyer would pay a willing seller $158,650 for the property before the condemnation, assuming it was bought and sold as residential property, which was its highest and best use.

Ms. Matula testified that the pipeline was "virtually in the center" of the residential portion of the property—lying in the middle of the yard between the house and the outbuildings. She testified that the con-demnation of the property and construction of the pipeline would make the tract "totally a piece of agricultural property." The house would have no value unless it were used as a barn. Prospective buyers would be unable to add such additions as swimming pools, tennis courts, or a driveway. Ms. Matula stated that the property owner would have to inform a prospective buyer of the pipeline, and that disclosure of this information would "kill the deal." She therefore concluded that the fair market value of the property after the condemnation would be fifty-five percent less than the pre-condemnation value. She calculated that the value of the property would therefore be diminished by $87,257.

## 4. Albert Allen

All American called Albert Allen, a commercial-real-estate appraiser from Houston, Texas, as an expert witness. Mr. Allen testified that approximately one third of his practice was related to condemnation. He performed ninety-five percent of his condemnation work on behalf of condemnors. He testified that All American hired him to appraise the Ammermans' property and that he had no expertise in appraising single-family dwellings.

Mr. Allen valued the property by studying comparable sales for comparable properties in the area. He estimated that the value of the land before the condemnation was $97,650. He calculated this figure by multiplying 139 acres by the market value of the land per acre, which was $700 per acre. Mr. Allen did not value the buildings because, in his opinion, the location of the pipeline would have no impact on the residence or the other buildings.

Mr. Allen valued the condemned property at $1,406. He arrived at this figure by using a two-step process. He first multiplied 2.23 acres of land by $700 per acre. He then took ninety percent of this figure because All American was taking an easement rather than taking the property in fee. He allowed the Ammermans to retain ten percent of the rights to the property taken by the condemnation because he be-

lieved they could still obtain some use from that strip of property.

Mr. Allen estimated the property that would be condemned for the temporary construction easement at $156. He calculated this figure by multiplying 2.23 acres of land by $700 per acre. He then allowed the Ammermans to recover rent for the strip of land at ten percent of the value of the property for one year. Mr. Allen also allowed the Ammermans to recover $200 for the costs they would incur for moving a gasoline storage tank from the construction and permanent easement and then returning it to its original location once the pipeline was built.

Mr. Allen appraised the total amount of compensation the Ammermans should recover as a result of All American's condemnation at $1,762.

On cross-examination, Mr. Allen testified that the property would be put to its highest and best use if it were used for agriculture. He testified that he would not hesitate to build a home on top of an oil pipeline. He admitted, however, that it would be impossible for a purchaser to build corrals, swimming pools, tennis courts, or other facilities over the pipeline.

## DISCUSSION AND HOLDING

We recently reviewed the method by which a landowner's compensation for a partial condemnation of his property is to be determined. *See State v. Schmidt,* 805 S.W.2d 25 (Tex.App.1991, writ denied). In *Schmidt,* we reiterated the bedrock principle that "the objective of the judicial process under the constitution and statutes is to make the landowner whole and to award him only what he could have obtained for his land in a free market." *Id.* at 32 (citing *City of Fort Worth v. Corbin,* 504 S.W.2d 828, 831 (Tex.1974)).

■ In *Schmidt,* we thoroughly reviewed the statutory scheme governing the evidence to be admitted in assessing damages to a landowner from a condemnation and the method by which damages are to be actually assessed. 805 S.W.2d at 32–33 (reviewing Tex.Prop.Code Ann. §§ 21.-041–.042 (1984)). We concluded that the ultimate question in determining the value of the property remaining after condemnation was "one of proof as to market value and depreciation in market value, rather than to abstract questions as to what may or may not be considered by the [fact finder] in assessing damages." *Id.* at 33 (quoting *State v. Carpenter,* 126 Tex. 604, 89 S.W.2d 194, 199 (Tex.1936)). "Market value" is defined ordinarily in terms of what the property would bring in a transaction between a willing seller and a willing buyer. *City of Austin v. Cannizzo,* 153 Tex. 324, 267 S.W.2d 808, 812 (1954); *Carpenter,* 89 S.W.2d at 201–202.

■ In this cause, the Ammermans presented the testimony of two expert witnesses regarding the price the land would bring in a transaction between a willing seller and a willing buyer. This testimony provided the trial judge with more than a sufficient amount of evidence upon which he could conclude that a willing buyer would pay a willing seller $75,588.75 less for the tract after the condemnation than the buyer would have paid before the condemnation. The trial judge could consider all evidence related to such matters as suitability and adaptability, surroundings, conditions before and after, and all circumstances which would tend to increase or diminish the pre-condemnation market value of the property. *Carpenter,* 89 S.W.2d at 200; *Schmidt,* 805 S.W.2d at 33.

■ All American does not challenge the admissibility of the Ammermans' evidence; instead, it argues that the Ammermans' witnesses did not offer any reasonable information concerning the general public's fear of being in close proximity to a crude-oil pipeline. All American argues that the amount of damages the Ammermans' witnesses testified to is mere conclusion and that there is no basis for their assumptions.

In support of this argument, All American cites *Tennessee Gas & Transmission Co. v. Zirjacks,* 244 S.W.2d 837 (Tex.Civ. App.1951, writ dism'd). In *Zirjacks,* the condemnors condemned a fifty-foot wide strip of property that ran through a 174.5 acre tract of land for the purpose of install-

ing a gas pipeline. The total amount of condemned property was 2.13 acres. The jury awarded the condemnees damages based on testimony indicating that the entire property would be worth $15 less per acre after the condemnation. There was apparently no evidence presented to indicate that any improvements had been made on the property. The court of appeals reviewed the testimony and found that there was no specific testimony detailing how the installation of the pipeline "would affect the value of the land lying outside the fifty-foot strip." *Id.* at 839.

*Zirjacks* is distinguishable from this cause. In this cause, there was ample expert witness testimony to demonstrate that the entire property was best used as a ranch residence. It was undisputed that the pipeline would run directly through the residential portion of the property. Evidence revealed that, after the condemnation, the property would be considerably less desirable as a residence in the mind of a willing buyer. The damage award was not based on a per-acre value, but rather on the diminution in value of the entire property as a residence and small ranch following the condemnation.

■ The record does not indicate that the trial court awarded the Ammermans damages based on a prospective fear in the minds of the buying public. However, even if the trial court did consider potential fear, it was entitled to do so under the facts of this case. *See Heddin v. Delhi Gas Pipeline Company,* 522 S.W.2d 886, 888 (Tex.1975). A Bureau of Land Management Record of Decision on the All American Pipeline Texas Extension, which was admitted into evidence, indicated that twenty-seven oil spills could be expected along the pipeline from California to the Gulf Coast, with the average spill being 3,750 barrels. This evidence is not the type that is predicated on "fancy, delusion or imagination," but is rather the type of evidence that shows either an actual danger that forms the basis of fear or the type of fear which is reasonable. The trial court could therefore properly consider this evidence. *See Heddin* 522 S.W.2d at 888–89.

We hold that the evidence was legally and factually sufficient to support the trial court's damage award of $75,588.75. The damage award was within the range of damages testified to by the Ammermans' expert witnesses, and we will not substitute our opinion of values for that of the trier of fact. *See Trinity River Authority of Texas v. Barrett,* 497 S.W.2d 91, 96 (Tex.Civ.App.1973, no writ); *State v. Sides,* 348 S.W.2d 446, 453 (Tex.Civ.App. 1961, writ ref'd n.r.e.). We overrule All American's point of error.

The judgment of the trial court is affirmed.