all american pipeline v. ammerman 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-89-259-CV





ALL AMERICAN PIPELINE COMPANY



vs.





CHARLES H. AMMERMAN AND WIFE, LOIS AMMERMAN,



 APPELLEE



 




FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT



NO. 21,647, HONORABLE CHARLES E. LANCE, JUDGE



 




 Appellant All American Pipeline Company ("All American")
initiated condemnation proceedings against property owned by
appellees Charles and Lois Ammerman ("the Ammermans"). All
American sought to obtain a right-of-way easement through the
residential portion of the Ammermans' 139.5 acre tract of land
located in Milam County, Texas. The Ammermans contested the
special commissioners' award of $11,760 in damages. In a non-jury
trial, the district court awarded the Ammermans the sum of
$75,588.75 in damages. All American appeals this judgment. We
will affirm the judgment of the district court.


THE CONTROVERSY



 All American filed a petition in condemnation by which it
sought to condemn a portion of the Ammermans' property for the
construction and maintenance of a heated crude oil pipeline. All
American sought a right of way consisting of a fifty foot wide,
2.23-acre permanent easement through the residential portion of a
139.5 acre tract of land owned by the Ammermans. All American also
sought an additional fifty foot wide, 2.23 acre temporary
construction easement that would adjoin the permanent easement. 
The total acreage to be included in both easements was 4.46 acres.

 The district judge appointed special commissioners to
hear the case. The special commissioners awarded the Ammermans
$11,760 in damages. The Ammermans objected to the commissioners'
award and appealed to the district court. The case was tried to
the court. The Ammermans adduced testimony from two expert
witnesses who testified to the diminished value of the property. 
All American also presented testimony from an expert witness. The
trial court awarded the Ammermans $75,588.75 for the reduction in
market value of the property caused by the condemnation and
pipeline construction.

 All American appeals the trial court's award of damages. 
All American argues in a single point of error that the evidence
adduced at trial was legally and factually insufficient to support
the trial court's judgment. 

 

THE EVIDENCE


 

 In reviewing a "no evidence" challenge, we consider only
the evidence and reasonable inferences drawn therefrom which, when
viewed in their most favorable light, support the court finding. 
Stafford v. Stafford, 726 S.W.2d 14, 16 (Tex. 1987); Alm v.
Aluminum Co. of America, 717 S.W.2d 588, 593 (Tex. 1986). Any
probative evidence supporting the finding will be sufficient to
overrule the point of error. Calvert, "No Evidence and
"Insufficient Evidence" Points of Error," 38 Texas L. Rev. 361, 364
(1960). See also Powers & Ratliff, Another Look at "No Evidence"
and "Insufficient Evidence" 69 Texas L. Rev. 515, 522 (1991).

 We will sustain American's "insufficient evidence"
challenge will be sustained only if, after reviewing the entire
record, the finding is so contrary to the overwhelming weight of
the evidence as to be clearly wrong and unjust. See Lofton v.
Texas Brine Corp., 720 S.W.2d 804, 805 (Tex. 1986).

 The Ammermans presented testimony from three witnesses: 
Lois Ammerman and expert witnesses G.D. Fleming and Judy Matula. 
All American presented testimony from Albert N. Allen, its expert
witness. We will review in detail the testimony adduced from each
witness in order to determine whether the trial court's judgment is
sufficiently supported by the evidence.



1. Lois Ammerman 


 Mrs. Ammerman testified that she and her family had lived
in a house on the tract in question since they purchased the
property in 1979. The Ammermans had improved the property in
recent years by adding an addition to the house, a heating system,
a garage, a deck, a barn, horse stalls, and by making other
miscellaneous improvements. The Ammermans spent a total of $75,000
improving the property. Mrs. Ammerman stated that the property was
best used as a home for her family.

 Mrs. Ammerman testified that the proposed pipeline would
run between their home and a nearby equipment shed. She stated
that the distance between the house and garage area and the
proposed pipeline was about thirty yards. Thus, because the family
members walk between their home and the equipment shed many times
daily, Mrs. Ammerman testified that she would be "literally living
on top of" the pipeline.



2. G.D. Fleming


 G.D. Fleming testified that he was a real estate broker
in Milam County. He had also been a banker and a real estate
appraiser for a lending institution. Mr. Fleming testified that he
examined the Ammermans' property and found it to be well maintained
and in near-excellent condition. He calculated the fair market
value of the property before to the condemnation to be $159,800, 
and calculated the fair market value of the property after the
condemnation to be $95,880. Mr. Fleming concluded that a willing
buyer would pay a willing seller $63,920 less for the property
after the condemnation than before.

 Mr. Fleming testified that the only reason for the major
depreciation in the value of the property was the close proximity
of the pipeline to the living quarters. He stated that the garage
of the residence was approximately thirty yards, or ninety feet,
from the center line of the pipeline. He also testified that,
before the condemnation, the highest and best use of the property
was as a residence and small farming ranch. He stated that, after
the condemnation, the highest and best use of the property would be
agricultural. He felt he had an obligation to inform a prospective
buyer of the existence of the pipeline next to the house. It was
his expert opinion that, after talking to other residents in the
community, potential buyers "wouldn't have it at any price as a
residence." 



3. Judy Matula


 Judy Matula testified that she had been a licensed real-
estate agent in Milam County for over ten years. She stated that
she had inspected the Ammermans' property on two occasions. It was
her opinion that a willing buyer would pay a willing seller
$158,650 for the property before the condemnation, assuming it was
bought and sold as residential property, which was its highest and
best use.

 Ms. Matula testified that the pipeline was "virtually in
the center" of the residential portion of the property -- lying in
the middle of the yard between the house and the outbuildings. She
testified that the condemnation of the property and construction of
the pipeline would make the tract "totally a piece of agricultural
property." The house would have no value unless it were used as a
barn. Prospective buyers would be unable to add such additions as
swimming pools, tennis courts, or a driveway. Ms. Matula stated
that the property owner would have to inform a prospective buyer of
the pipeline, and that disclosure of this information would "kill
the deal." She therefore concluded that the fair market value of
the property after the condemnation would be fifty-five percent
less than the pre-condemnation value. She calculated that the
value of the property would therefore be diminished by $87,257.



4. Albert Allen


 All American called Albert Allen, a commercial real
estate appraiser from Houston, Texas, as an expert witness. 
Mr. Allen testified that approximately one third of his practice
was related to condemnation. He performed ninety-five percent of
his condemnation work on behalf of condemnors. He testified that
All American hired him to appraise the Ammermans' property and that
he had no expertise in appraising single-family dwellings.

 Mr. Allen valued the property by studying comparable
sales for comparable properties in the area. He estimated that the
value of the land before the condemnation was $97,650. He
calculated this figure by multiplying 139 acres by the market value
of the land per acre, which was $700 per acre. Mr. Allen did not
value the buildings because, in his opinion, the location of the
pipeline would have no impact on the residence or the other
buildings. 

 Mr. Allen valued the condemned property at $1,406. He
arrived at this figure by using a two-step process. He first
multiplied 2.23 acres of land by $700 per acre. He then took
ninety percent of this figure because All American was taking an
easement rather than taking the property in fee. He allowed the
Ammermans to retain ten percent of the rights to the property taken
by the condemnation because he believed they could still obtain
some use from that strip of property.

 Mr. Allen estimated the property that would be condemned
for the temporary construction easement at $156. He calculated
this figure by multiplying 2.23 acres of land by $700 per acre. He
then allowed the Ammermans to recover rent for the strip of land at
ten percent of the value of the property for one year. Mr. Allen
also allowed the Ammermans to recover $200 for the costs they would
incur for moving a gasoline storage tank from the construction and
permanent easement and then returning it to its original location
once the pipeline was built.

 Mr. Allen appraised the total amount of compensation the
Ammermans should recover as a result of All American's condemnation
at $1,762. 

 On cross-examination, Mr. Allen testified that the
property would be put to its highest and best use of the property
if it were used for agriculture. He testified that he would not
hesitate to build a home on top of an oil pipeline. He admitted,
however, that it would be impossible for a purchaser to build
corrals, swimming pools, tennis courts, or other facilities over
the pipeline.



DISCUSSION AND HOLDING



 We recently reviewed the method by which a landowner's
compensation for a partial condemnation of his property is to be
determined. See State v. Schmidt, 805 S.W.2d 25 (Tex. App. 1991,
writ denied). In Schmidt, we reiterated the bedrock principle that
the objective of the judicial process under the constitution and
statutes is to make the landowner whole and to award the landowner
only what could have been obtained for the land in a free market. 
Id. at 32 (citing City of Fort Worth v. Corbin, 504 S.W.2d 828, 831
(Tex. 1974)). 

 In Schmidt, we thoroughly reviewed the statutory scheme
governing the evidence to be admitted in assessing damages to a
landowner from a condemnation and the method by which damages are
to be actually assessed. 805 S.W.2d at 32-33 (reviewing Tex. Prop.
Code Ann. §§ 21.041 - .042 (1984)). We concluded that the ultimate
question in determining the value of the property remaining after
condemnation was "one of proof as to market value and depreciation
in market value, rather than to abstract questions as to what may
or may not be considered by the [fact finder] in assessing
damages." Id. at 33 (quoting State v. Carpenter, 89 S.W.2d 194,
199 (Tex. 1936)). "Market value" is defined ordinarily in terms of
what the land would bring in a transaction between a willing seller
and a willing buyer. City of Austin v. Cannizo, 267 S.W.2d 808,
812 (Tex. 1954); Carpenter, 80 S.W.2d at 201-202.

 In this cause, the Ammermans presented the testimony of
two expert witnesses regarding the price the land would bring in a
transaction between a willing seller and a willing buyer. This
testimony provided the trial judge with more than a sufficient
amount of evidence upon which he could conclude that a willing
buyer would pay a willing seller $75,588.75 less for the tract
after the condemnation than the buyer would have paid before the
condemnation. The trial judge could consider all evidence related
to such matters as suitability and adaptability, surroundings,
conditions before and after, and all circumstances which would tend
to increase or diminish the pre-condemnation market value of the
property. Carpenter, 89 S.W.2d at 200; Schmidt, 805 S.W.2d at 33.

 All American does not challenge the admissibility of the
Ammermans' evidence; instead, it argues that the Ammermans'
witnesses did not offer any reasonable information concerning the
general public's fear of being in close proximity to a crude-oil
pipeline. All American argues that the amount of damages the
Ammermans' witnesses testified to is mere conclusion and that
there is no basis for their assumptions. 

 In support of this argument, All American cites Tennessee
Gas & Transmission Co. v. Zirjacks, 244 S.W.2d 837 (Tex. Civ. App.
1951, writ dism'd). In Zirjacks, the condemnors condemned a fifty-foot wide strip of property that ran through a 174.5 acre tract of
land for the purpose of installing a gas pipeline. The total
amount of condemned property was 2.13 acres. The jury awarded the
condemnees damages based on testimony indicating that the entire
property would be worth $15 less per acre after the condemnation. 
There was apparently no evidence presented to indicate that any
improvements had been made on the property. The court of appeals
reviewed the testimony and found that there was no specific
testimony detailing how the installation of the pipeline "would
affect the value of the land lying outside the fifty-foot strip." 
Id. at 839.

 Zirjacks is distinguishable from this cause. In this
cause, the evidence demonstrated that the entire property was best
used as a ranch residence. The evidence demonstrated that the
pipeline would run directly through the residential portion of the
property. The evidence indicated that, after the condemnation, the
property would be considerably less desirable as a residence in the
mind of a willing buyer. The damage award was not based on a per
acre value, but rather on the diminution in value of the entire
property as a residence and small ranch.

 The record does not indicate that the trial court awarded
the Ammermans damages based on a prospective fear in the minds of
the buying public. However, even if the trial court did consider
potential fear, it was entitled to do so under the facts of this
case. See Heddin v. Delhi Gas Pipeline Company, 522 S.W.2d 886,
888 (Tex. 1975). A Bureau of Land Management Record of Decision on
the All American Pipeline Texas Extension, which was admitted into
evidence, indicated that twenty-seven oil spills could be expected
along the pipeline from California to the Gulf Coast, with the
average spill being 3,750 barrels. This evidence is not the type
that is predicated on "fancy, delusion or imagination," but is
rather the type of evidence that shows either an actual danger that
forms the basis of fear or the type of fear which is reasonable. 
The trial court could therefore properly consider this evidence. 
See Heddin 522 S.W.2d at 888-89.

 We hold that the evidence was legally and factually
sufficient to support the trial court's damage award of $75,588.75
in damages to the Ammermans. The damage award was within the range
of damages testified to by the Ammermans' expert witnesses, and we
will not substitute our opinion of values for that of the trier of
fact. See Trinity River Authority of Texas v. Barrett, 497 S.W.2d
91, 96 (Tex. Civ. App. 1973, no writ); State v. Sides, 348 S.W.2d
446, 453 (Tex. Civ. App 1961, writ ref'd n.r.e.). We overrule All
American's point of error.

 The judgment of the trial court is accordingly affirmed.



 

 Mack Kidd, Justice

[Before Justices Powers, Aboussie and Kidd]

Affirmed

Filed: August , 1991

[Publish]