**WEINGARTEN REALTY INVESTORS, Plaintiff,**

v.

**ALBERTSON'S, INC., Defendant.**

**No. Civ.A. H–98–0912.**

United States District Court, S.D. Texas.

Sept. 24, 1999.

Billy Edward Williamson, Dow Cogburn & Friedman, Houston, TX, for Weingarten Realty Investors, plaintiff.

Brian F Antweil, Winstead Sechrest & Minick, Houston, TX, for Albertson's Inc, defendant.

Brian F Antweil, Winstead Sechrest & Minick, Houston, TX, for Albertson's Inc., counter-claimant.

Billy Edward Williamson, Dow Cogburn & Friedman, Houston, TX, for Weingarten Realty Investors, counter-defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant Albertson's, Inc.'s ("Albertson's") Motion for Interlocutory Summary Judgment (# 23), Plaintiff Weingarten Realty Investors's ("Weingarten") Motion for Partial Summary Judgment (# 31), and Plaintiff Weingarten's Motion for Summary Judgment on all Liability Issues (# 41). Having reviewed the pending motions, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that Albertson's motion for interlocutory summary judgment should be granted, Weingarten's motion for partial summary judgment should be denied, and Weingarten's motion for summary judgment on all liability issues should be granted in part and denied in part.

### I. Background

On July 28, 1988, Weingarten's predecessor, Weingarten/Lubbock, Inc., as landlord, entered into a document entitled "Lease Contract" with Albertson's predecessor in interest, Furr's, Inc. ("Furr's"), as tenant, for commercial space in the Town & Country Shopping Center in Lubbock, Texas. On October 7, 1991, pursuant to an assignment from Furr's, Albertson's assumed all liabilities and rights of the tenant under the Lease Contract.

The Lease Contract provides for a primary term of fifteen years, ending on June 30, 2004, with an option to extend the term for three additional sixty-month periods. Under Article VII of the Lease Contract, Weingarten, as landlord, is obligated to provide a "Common Area" in the shopping center and to make necessary repairs to such area. The Common Area includes parking spaces for customers and employees of the tenants, service drives and roads, traffic islands, loading and service areas, sidewalks, landscaped areas, roofs, gutters and downspouts, and sprinkler risers. In addition, Weingarten agrees not to make any changes to certain portions of the Common Area without the consent of the tenant. The tenant is obligated to pay a "Common Area Payment" as additional rent to cover a proportionate share of the "Common Area Operating Costs" plus an administrative fee. In Article VIII, the tenant, after once opening a supermarket in the leased premises, is given the right, after 150 days' prior written notice to the landlord, to cease operations and discontinue conducting the supermarket business, but nevertheless remains obligated to perform all covenants and agreements under the Lease Contract, including the payment of rent. Under Article XVI, "[f]ailure or refusal by Tenant to timely pay Minimum Rent or Percentage Rent or any other sum when due hereunder" is designated an

"Event of Default." Article XIX of the Lease Contract addresses the issue of eminent domain:

### ARTICLE XIX

#### Eminent Domain

Section 19.01. If there shall be taken during the term of this Lease any portion of the Leased Premises, by any authority having the power of eminent domain, then and in that event, the term of this Lease shall cease and terminate, and the date of such termination shall be, at Landlord's or Tenant's election, the earlier of either the date upon which possession shall be tendered to such authority by Landlord or the date upon which possession is taken by such authority.

Section 19.02. Whether or not any portion of the Leased Premises may be taken by such authority, either Landlord or Tenant may nevertheless elect to terminate this Lease or to continue this Lease in effect in the event any portion of any building in the portion of the Shopping Center outlined in green, or more than twenty five percent (25%) of the Common Area of the Shopping Center be taken by such authority.

Section 19.03. Separate awards for damages to the respective interests of Landlord and Tenant shall be made, and each shall be entitled to receive and retain such awards as shall be made to it, and the termination of this Lease shall not affect the rights of the respective parties to the awards. In addition Tenant shall be entitled to a portion of any award to Landlord for improvements comprising the Leased Premises taken in such amount as necessary to enable Tenant to recover any unrecovered amount of its certified cost and accrued interest on the new addition added by Tenant.

In 1996, the Texas Department of Transportation ("TxDOT") gave notice of its intent to initiate condemnation proceedings for a substantial portion of the shopping center's parking lot needed for expansion of U.S. Highway 82 into a controlled access, east-west freeway through Lubbock. On October 21, 1996, TxDOT sent a letter to Albertson's advising that "[t]his Department assists persons displaced by the purchase of land for highway purposes through our ' "Relocation Assistance Program," ' " summarizing the highlights of the program. By letter to Albertson's dated December 30, 1996, TxDOT "acknowledge[d] your lessee's interest in the property" and advised that "[Albertson's], and the other affected tenants, will be joined in our condemnation suit." On April 23, 1997, TxDOT forwarded a quitclaim deed to Albertson's, explaining that if it wished to be excluded from potential condemnation proceedings, it could sign the deed releasing its interest in the property to be condemned, but Albertson's declined to do so. On July 17, 1997, TxDOT sent correspondence to Albertson's entitled "Proposed Condemnation Proceedings," informing Albertson's that it was "being joined as a party to the State's condemnation proceedings," noting that it could avoid being named a party by signing the quitclaim deed.

Nevertheless, on August 18, 1997, Weingarten, in lieu of condemnation proceedings, agreed to convey the property to TxDOT for the sum of $8,475,000.00, as set forth in a "Memorandum of Agreement" dated August 14, 1997, and a "Settlement Agreement" executed August 18, 1997, between Weingarten and TxDOT. On that same day, Weingarten executed and acknowledged a deed conveying the necessary right-of-way to the State. The following day, the deed was delivered to the Stewart Title Company, which had been designated by TxDOT as "the State's closing agent" in the Memorandum of Agreement. The deed was recorded on August 26, 1997. Also on August 26, Weingarten signed and acknowledged a document entitled "Lease Agreement," whereby TxDOT leased the conveyed right-of-way to Weingarten for a maximum term of four years, subject to cancellation by either party upon twelve months' written notice. On

September 26, 1997, TxDOT sent Albertson's a notice entitled "Cancellation of Proposed Condemnation Proceedings," informing Albertson's that "the State did not have to file condemnation proceedings for the acquisition of the subject parcel of land."

Albertson's sent written notice to Weingarten on November 25, 1997, terminating the Lease Contract under Article XIX and requesting its share of the eminent domain proceeds. Albertson's ceased operations at the site and vacated the shopping center on November 28, 1997. On January 27, 1998, TxDOT forwarded to Albertson's a form entitled "Claim for Actual Moving Expenses" pursuant to the State's Relocation Assistance Program. Albertson's subsequently submitted a claim and was paid $91,023.00 for its moving expenses. Weingarten, after several attempts to resolve this dispute, sent a notice of default to Albertson's on February 5, 1998. On March 31, 1998, Weingarten instituted this breach of contract action to collect unpaid rent and other damages, along with attorneys' fees and costs. Albertson's filed a counterclaim asserting claims for declaratory relief, civil rights violations, and breach of contract, seeking the recovery of actual and punitive damages, as well as attorneys' fees and costs.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir.1999); *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 321 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 324 (5th Cir.1997), *cert. denied*, 523 U.S. 1017, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). The moving party, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Colson*, 174 F.3d at 506; *Marshall*, 134 F.3d at 321–22; *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075. All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.*, 987 F.2d 324, 327 n. 14 (5th Cir.1993)); *see Colson*, 174 F.3d at 506; *Marshall*, 134 F.3d at 321; *Messer v. Meno*, 130 F.3d 130, 134 (5th Cir.1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999); *Hart v. O'Brien*, 127 F.3d 424, 435 (5th Cir.1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999); *Songbyrd, Inc. v. Bearsville Records, Inc.*, 104 F.3d 773, 776 (5th Cir.1997). " 'The evidence of the non-movant is to be believed, and all justifiable inferences are to be

drawn in his favor.'" *Reves v. Ernst & Young,* 507 U.S. 170, 190 n. 3, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *see Marshall,* 134 F.3d at 321. Nonetheless, "'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.'" *Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072.

The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075; *see Hart,* 127 F.3d at 435; *Wallace,* 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir. 1990) (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case on which it bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Wenner,* 123 F.3d at 324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

**B. Contractual Claims**

**1. Breach of Contract**

Weingarten claims that Albertson's breached the Lease Contract when it vacated the shopping center on November 28, 1997, and ceased paying rent. Albertson's maintains that no breach occurred because it was entitled to terminate the lease when TxDOT took more than twenty-five percent of the shopping center's common area. Albertson's also asserts a counterclaim alleging that Weingarten breached the Lease Contract when it failed to turn over a portion of the payment received from the State for the conveyance of the common area.

█ In Texas, the essential elements of a breach of contract action are: (1) the existence of a valid contract between the parties; (2) the plaintiff's performance or tendered performance of the contract; (3) the defendant's breach of the contract; and (4) the plaintiff's damage resulting from the breach. *See Perry Williams, Inc. v. FDIC,* 47 F.Supp.2d 804, 810 (N.D.Tex.1999); *Bank One, Tex., N.A. v. FDIC,* 16 F.Supp.2d 698, 713 (N.D.Tex. 1998); *W.G. Pettigrew Distrib. Co. v. Borden, Inc.,* 976 F.Supp. 1043, 1052 (S.D.Tex. 1996), *aff'd,* 127 F.3d 34 (5th Cir.1997); *Elf Exploration, Inc. v. Cameron Offshore Boats, Inc.,* 863 F.Supp. 386, 390 (S.D.Tex. 1994); *Scott v. Sebree,* 986 S.W.2d 364, 372 (Tex.App.—Austin 1999, pet. denied); *Southwell v. University of the Incarnate Word,* 974 S.W.2d 351, 354–55 (Tex.App.— San Antonio 1998, no pet.); *Prudential Secs., Inc. v. Haugland,* 973 S.W.2d 394, 396 (Tex.App.—El Paso 1998, no pet.); *Wright v. Christian & Smith,* 950 S.W.2d 411, 412 (Tex.App.—Houston [1st Dist.] 1997, no writ). Generally, an actionable breach of contract occurs only when one of the parties to a contract commits a material breach which substantially impairs the rights of the other contracting party. *See Doherty v. DeVaughn,* No. 14–97–00624– CV, 1998 WL 502950, at *3 (Tex.App.— Houston [14th Dist.] Aug. 20, 1998, no pet.) (citing *Hernandez v. Gulf Group Lloyds,*

875 S.W.2d 691, 692 (Tex.1994)). "In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance." *Hernandez*, 875 S.W.2d at 692–93; *see Davis v. Allstate Ins. Co.*, 945 S.W.2d 844, 846 (Tex.App.—Houston [1st Dist.] 1997, no writ); *Herter v. Wolfe*, 961 S.W.2d 1, 4 (Tex.App.—Houston [1st Dist.] 1995, writ denied).

### 2. *Construction of Lease*

■■■ The primary dispute in this action focuses on the proper construction to be given Section 19.02 of the Lease Contract.

"Leases are construed, like other written agreements, so as to give effect to the intention of the parties. To arrive at the intention, regard is to be had to the situation of the parties, the subject matter of the agreement, the object which the parties had in view at the time, and intended to accomplish. A construction should be avoided if it can be done consistently with the tenor of the agreement, which would be unreasonable or unequal; and that construction which is most obviously just is to be favored, as most in accordance with the presumed intention of the parties."

*Ervay, Inc. v. Wood*, 373 S.W.2d 380, 384 (Tex.Civ.App.—Dallas 1963, writ ref'd n.r.e.) (quoting *Howeth v. Anderson*, 25 Tex. 557, 1860 WL 5924, at *10 (1860)); *accord Orr v. Vandygriff*, 251 S.W.2d 573, 574 (Tex.Civ.App.—Waco 1952, no writ). Courts utilize the general rules of contract construction when construing a lease. *See Hasty Inc. v. Inwood Buckhorn Joint Venture*, 908 S.W.2d 494, 499 (Tex.App.—Dallas 1995, writ denied); *Goldman v. Alkek*, 850 S.W.2d 568, 576 (Tex.App.—Corpus Christi 1993, writ dism'd); *Neiman–Marcus Co. v. Hexter*, 412 S.W.2d 915, 919 (Tex.Civ.App.—Dallas 1967, writ ref'd n.r.e.); *McLemore v. Compton*, 275 S.W. 487, 490 (Tex.Civ.App.—Fort Worth 1925, no writ). When interpreting a lease, the court must "examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined." *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996) (citing *Steeger v. Beard Drilling, Inc.*, 371 S.W.2d 684, 688 (Tex.1963)). Terms are given "their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Id.*

■■■ As when construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent. *See Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996); *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex.1983); *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex.1980). "[T]he cardinal rule to be observed in the construction of contracts is to ascertain and give effect to the real intention of the parties, as that intention is revealed by the language used in the agreement." *Ervay, Inc.*, 373 S.W.2d at 384. When making its interpretation, the court will view the agreement as of the time it was made and not in the light of subsequent events. *See id.*

■■■ Under the "four corners rule," the intention of the parties is to be gathered from the instrument as a whole. *See Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex.1987); *Ervay, Inc.*, 373 S.W.2d at 384. The "court is bound to read all parts of a contract together to ascertain the agreement of the parties." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994); *accord Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 180 (Tex. 1965). Each part of the contract should be given full effect. *See Lenape Resources Corp.*, 925 S.W.2d at 574; *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987). The court should "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Coker v. Coker,*

650 S.W.2d 391, 393 (Tex.1983); *see R & P Enters.*, 596 S.W.2d at 519 (citing *Southland Royalty Co. v. Pan Am. Petroleum Corp.*, 378 S.W.2d 50, 53 (Tex.1964); *Steeger*, 371 S.W.2d at 688). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker*, 650 S.W.2d at 393. This is merely an application of the long-established rule in Texas that "[n]o one phrase, sentence or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *Guardian Trust Co. v. Bauereisen*, 132 Tex. 396, 121 S.W.2d 579, 583 (1938).

■■■■■ A basic tenet of contractual construction holds that, whenever feasible, an agreement is to be interpreted in a manner that renders performance possible rather than impossible. *See Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 722 (5th Cir.1995); *see also Temple–Eastex, Inc. v. Addison Bank*, 672 S.W.2d 793, 798 (Tex.1984). "[I]n case of a reasonable doubt as to which of two constructions best accords with the intent of the parties, that construction should prevail which is least favorable to the party who prepared the instrument." *Ervay, Inc.*, 373 S.W.2d at 384; *see Alkek*, 850 S.W.2d at 576. Similarly, in case of any doubt as to the intention of parties to a lease, "it will be construed most strongly against the lessor." *Myers v. Ginsburg*, 735 S.W.2d 600, 603 (Tex.App.—Dallas 1987, no writ); *see Frank v. Kuhnreich*, 546 S.W.2d 844, 848 (Tex.Civ.App.—San Antonio 1977, writ ref'd n.r.e.). In addition, "the acts and conduct of the parties themselves, including acts done in the course of performance, which indicate the construction that the parties themselves put on the contract, may properly be considered by the court in interpreting the agreement." *Ervay, Inc.*, 373 S.W.2d at 384; *see Trinity Universal Ins. Co. v. Ponsford Bros.*, 423 S.W.2d 571, 575 (Tex.1968).

■■■■■ An unambiguous contract must be interpreted by the court as a matter of law. *See Coker*, 650 S.W.2d at 393; *Alkek*, 850 S.W.2d at 576; *Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.*, 750 S.W.2d 820, 822 (Tex.App.—Houston [14th Dist.] 1988, writ denied). The question of "whether a contract is ambiguous is 'a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered.'" *Exxon Corp. v. West Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex.1993) (quoting *Coker*, 650 S.W.2d at 393–94); *see Heritage Resources, Inc.*, 939 S.W.2d at 121. Under Texas law, a contract is ambiguous if, after applying the established rules of interpretation, the written instrument "remains reasonably susceptible to more than one meaning." *R & P Enters.*, 596 S.W.2d at 519; *see Lenape Resources Corp.*, 925 S.W.2d at 574; *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979) (requiring a "genuine uncertainty" as to which of two meanings is proper). A "written instrument is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning, taking into consideration the circumstances present when the instrument was executed." *Towers of Tex., Inc. v. J & J Sys., Inc.*, 834 S.W.2d 1, 2 (Tex.1992). In this regard, "[l]anguage should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated." *Reilly*, 727 S.W.2d at 529 (citing *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex.1966)). An ambiguity does not arise, however, merely because the parties advance conflicting interpretations of the contract. *See Forbau*, 876 S.W.2d at 134; *Crown Constr. Co. v. Huddleston*, 961 S.W.2d 552, 556 (Tex. App.—San Antonio 1997, no pet.). In order for an ambiguity to exist, both interpretations must be reasonable. *See Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995); *Huddleston*, 961 S.W.2d at 555. If a contract remains ambiguous despite the application of these principles, the court may then consider extrinsic evidence to ascertain the parties'

intent. *See Lenape Resources Corp.*, 925 S.W.2d at 574; *Steeger*, 371 S.W.2d at 688.

On the other hand, if a contract is worded so that a court can give it a certain or definite legal meaning or interpretation, it is not ambiguous. *See R & P Enters.*, 596 S.W.2d at 519. Where the contract is unambiguous, extrinsic evidence "will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951); *see Lewis v. East Tex. Fin. Co.*, 136 Tex. 149, 146 S.W.2d 977, 980 (1941). The court must enforce the unambiguous language in a contract as written, and the applicable standard is the "objective intent" evidenced by the language used, rather than the subjective intent of the parties. *See Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981).

In the case at bar, the court finds that Section 19.02, along with the entirety of Article XIX of the Lease Contract, is not ambiguous. Section 19.02 provides:

> Whether or not any portion of the Leased Premises may be taken by such authority, either Landlord or Tenant may nevertheless elect to terminate this Lease or to continue this Lease in effect in the event any portion of any building in the portion of the Shopping Center outlined in green, or more than twenty five percent (25%) of the Common Area of the Shopping Center be taken by such authority.

This section gives the tenant the right to terminate the Lease Contract if more than twenty-five percent of the common area of the shopping center is taken through eminent domain by a condemning authority. It is apparent that the word "taken," as used in this section, alludes to the government's exercise of the power of eminent domain. The words "such authority" are given meaning through Section 19.01 which refers to "... any authority having the power of eminent domain ...." This language, when analyzed in the context of the entire Lease Contract, assumes a certain and definite legal meaning, and, therefore, is not ambiguous. *See R & P Enters.*, 596 S.W.2d at 519. Thus, under the plain language of Section 19.02, construed most strongly against the lessor, the tenant has the right to terminate the lease when a governmental authority takes through the exercise of eminent domain more than twenty-five percent of the common area of the shopping center.[1]

Weingarten maintains, however, that no "taking" occurred in this case, arguing that for property to be "taken," the governmental authority must have actually taken possession as well as title to the property, pointing to the use of the word "possession" in Section 19.01 of the Lease Contract. This notion is belied both by the language of the Lease Contract and controlling precedent. A review of Article XIX reveals that Section 19.01 applies only when all or a portion of the tenant's leasehold is taken by the government, in which event, the lease automatically terminates and the tenant must necessarily surrender possession. The concept of possession is operative in determining the date on which the lease terminates. Section 19.02, in contrast, addresses the situation where,

---

1. The court discounts the affidavits of Jeffrey A. Tucker and James S. Pleasant, proffered by Weingarten, because "oral statements of the parties' intent are inadmissible to vary or contradict the terms of the agreement." *Medical Towers, Ltd.*, 750 S.W.2d at 823. Parol evidence is not admissible to vary the terms of an unambiguous document. *See Herbert v. Polly Ranch Homeowners Ass'n*, 943 S.W.2d 906, 910 (Tex.App.—Houston [1st Dist.] 1996, no writ). "In the absence of any ambiguity, accident, mistake, or fraud shown in connection with the contract, the parol evidence rule 'renders inadmissible any testimony to vary the legal effect of a writing[.]'" *Hartford Ins. Co. v. Commerce & Indus. Ins. Co.*, 864 S.W.2d 648, 650 (Tex.App.—Houston [1st Dist.] 1993, writ denied) (quoting *Huddleston v. Fergeson*, 564 S.W.2d 448, 452 (Tex.Civ. App.—Amarillo 1978, no writ)); *accord Herbert*, 943 S.W.2d at 910.

although the tenant's leasehold is not taken, other buildings or more than twenty-five percent of the common area of the shopping center are taken. In that event, the tenant or the landlord has the option to elect to terminate the lease. Possession is not material, as the tenant is not dispossessed of his leasehold and may, in fact, elect to continue the lease. Moreover, Section 19.01 is not limited to the taking of actual possession by the governmental authority, but also encompasses the scenario in which "possession shall be tendered to such authority." Hence, the Lease Contract does not specify actual physical possession as a condition precedent for termination when a governmental authority takes more than twenty-five percent of the common area of the shopping center.

### 3. Exercise of Power of Eminent Domain

 "[T]he power of eminent domain is an inherent attribute of sovereignty and exists independently of the Constitution." *City of San Antonio v. Congregation of the Sisters of Charity of the Incarnate Word, Inc.*, 404 S.W.2d 333, 334 (Tex.Civ.App.—Eastland 1966, no writ). "[T]he State in the exercise of its sovereign authority can take, damage or destroy property for public use subject to the right of the owner to recover adequate compensation." *Id.* (citing *Texas Highway Dep't v. Weber*, 147 Tex. 628, 219 S.W.2d 70, 71 (1949)). While the United States Constitution permits the government to take the property of a citizen for public use, the Fifth Amendment forbids the taking of private property without just compensation. *See Yee v. City of Escondido*, 503 U.S. 519, 522, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992); *United States v. Bodcaw Co.*, 440 U.S. 202, 203, 99 S.Ct. 1066, 59 L.Ed.2d 257 (1979); *Omnia Commercial Co. v. United States*, 261 U.S. 502, 509, 43 S.Ct. 437, 67 L.Ed. 773 (1923). The Fifth Amendment provides, in relevant part, "No person shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const.

amend. V. This provision is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See Trail Enters., Inc. v. City of Houston*, 957 S.W.2d 625, 630 (Tex.App.—Houston [14th Dist.] 1997, pet. denied), *cert. denied*, —— U.S. ——, 119 S.Ct. 802, 142 L.Ed.2d 663 (1999). "Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation." *Yee*, 503 U.S. at 522, 112 S.Ct. 1522. "But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Id.* at 522–23, 112 S.Ct. 1522.

 The Texas Constitution also contains a "Takings Clause," which provides that "[n]o person's property shall be taken, damaged or destroyed for or applied to a public use without adequate compensation being made." Tex. Const. art. I, § 17; *see Felts v. Harris County*, 915 S.W.2d 482, 484 (Tex.1996); *Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex.1992); *Texas Parks & Wildlife Dep't v. Callaway*, 971 S.W.2d 145, 148 (Tex.App.—Austin 1998, no pet.); *Trail Enters., Inc.*, 957 S.W.2d at 630. As with the United States Constitution, under the Takings Clause of the Texas Constitution, "an actual taking or physical appropriation is not required." *Felts*, 915 S.W.2d at 484; *see State v. Biggar*, 873 S.W.2d 11, 13 (Tex.1994); *City of Austin v. Teague*, 570 S.W.2d 389, 393 (Tex.1978); *DuPuy v. City of Waco*, 396 S.W.2d 103, 106 (Tex.1965); *State v. Hale*, 136 Tex. 29, 146 S.W.2d 731, 736 (1941). "An owner acquires a legal right to compensation when he sustains a legal injury respecting his 'property.' Under the condemnation statutes, this occurs when a condemnor acquires title to the whole or a part of the

owner's 'property.'" *State v. Schmidt*, 805 S.W.2d 25, 29 (Tex.App.—Austin 1991), *rev'd on other grounds*, 867 S.W.2d 769 (Tex.1993).

Generally, in Texas, "the government compensates the owner before appropriating property, either by paying a mutually agreed price or by paying the value as determined in a statutory condemnation proceeding." *Westgate, Ltd.*, 843 S.W.2d at 452; *see* TEX.PROP.CODE ANN. § 21.042; *Callaway*, 971 S.W.2d at 148; *Woodson Lumber Co. v. City of College Station*, 752 S.W.2d 744, 746 (Tex.App.—Houston [1st Dist.] 1988, no writ). "If, however, the government appropriates property without paying adequate compensation, the owner may recover the resulting damages in an 'inverse condemnation' suit." *Westgate, Ltd.*, 843 S.W.2d at 452; *see Teague*, 570 S.W.2d at 393; *Callaway*, 971 S.W.2d at 148; *Trail Enters., Inc.*, 957 S.W.2d at 630; *Woodson Lumber Co.*, 752 S.W.2d at 746. "An inverse condemnation may occur when the government physically appropriates or invades the property, or when it unreasonably interferes with the landowner's right to use and enjoy the property, such as by restricting access or denying a permit for development." *Westgate, Ltd.*, 843 S.W.2d at 452; *see Taub v. City of Deer Park*, 882 S.W.2d 824, 826 (Tex.1994), *cert. denied*, 513 U.S. 1112, 115 S.Ct. 904, 130 L.Ed.2d 787 (1995); *Teague*, 570 S.W.2d at 393; *Callaway*, 971 S.W.2d at 148; *Trail Enters., Inc.*, 957 S.W.2d at 630. "Governmental restrictions on the use of property can be so burdensome that they result in a compensable taking." *Id.*

In Texas, the statutory land condemnation procedure is a two-part process involving, first, an administrative hearing, and then, if necessary, a judicial proceeding. *See State v. Blackstock*, 879 S.W.2d 125, 126 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (citing *Amason v. Natural Gas Pipeline Co.*, 682 S.W.2d 240, 241–42 (Tex.1984)). When a condemning authority desires to condemn land for public use, but cannot agree on settlement terms with the landowner, the governmental authority must file a statement seeking condemnation in the proper court. *See* TEX. PROP.CODE ANN. § 21.012(a); *Blackstock*, 879 S.W.2d at 126. The statement or petition must be filed either in the district court or the county court at law of the county in which the land is located. *See* TEX.PROP.CODE ANN. §§ 21.001, 21.013; *Blackstock*, 879 S.W.2d at 126. Upon the filing of the petition, the trial court judge appoints as special commissioners three disinterested landowners who are residents of the county. *See id.* The special commissioners assess the damages of the landowner and submit an award which reflects their opinion regarding the value of the condemned land. *See* TEX.PROP.CODE ANN. §§ 21.014–21.016, 21.042; *Amason*, 682 S.W.2d at 241–42; *Blackstock*, 879 S.W.2d at 126. From the time the condemnor files the original statement or petition seeking condemnation until the time of the special commissioners' award, the proceeding is administrative in nature. *See Amason*, 682 S.W.2d at 242; *Lower Nueces River Water Supply Dist. v. Cartwright*, 160 Tex. 239, 328 S.W.2d 752, 754 (1959); *Blackstock*, 879 S.W.2d at 126. If the condemnor is satisfied with the award, it must either pay the amount of the award to the condemnee or deposit that amount in the court's registry. *See* TEX.PROP.CODE ANN. § 21.021(a)(1); *Blackstock*, 879 S.W.2d at 126. If there is dissatisfaction with the special commissioners' award, either party may file timely objections in the appropriate court. *See* TEX.PROP.CODE ANN. § 21.018(a); *Blackstock*, 879 S.W.2d at 126. Upon the filing of the objections, the special commissioners' award is vacated, and the administrative proceeding converts into a normal judicial case in civil court. *See* TEX.PROP.CODE ANN. § 21.018(b); *Amason*, 682 S.W.2d at 242; *Blackstock*, 879 S.W.2d at 126–27. TxDOT is a Texas governmental authority with the power of eminent domain. *See* TEX. TRANSP.CODE ANN. § 224.001.

In Texas, as in many jurisdictions, a genuine effort to purchase the land

by agreement between the parties, and a failure to do so, is a condition precedent to commencing condemnation proceedings:

> (a) If the United States, this state, a political subdivision of this state, a corporation with eminent domain authority, or an irrigation, water improvement, or water power control district created by law wants to acquire real property for public use but is unable to agree with the owner of the property on the amount of damages, the condemning entity may begin a condemnation proceeding by filing a petition in the proper court.

TEX.PROP.CODE ANN. § 21.012. In this case, the institution of formal condemnation proceedings was not required because Weingarten agreed to convey the property to TxDOT. The deed of conveyance specifically states that *"THE CONSIDERATION RECITED HEREIN REPRESENTS A SETTLEMENT AND COMPROMISE BY ALL PARTIES AS TO THE VALUE OF THE PROPERTY HEREIN CONVEYED IN ORDER TO AVOID FORMAL EMINENT DOMAIN PROCEEDINGS AND THE ADDED EXPENSES OF LITIGATION."* Weingarten's appraisal expert, David Bolton ("Bolton"), confirmed at deposition that "[t]he taking was . . . a negotiated purchase."

▆▆▆ An agreement to convey property to a governmental authority has the same effect as a formal condemnation proceeding. *See United States v. Petty Motor Co.*, 327 U.S. 372, 374–75, 66 S.Ct. 596, 90 L.Ed. 729 (1946); *Harris County Flood Control Dist. v. Glenbrook Patiohome Owners Ass'n*, 933 S.W.2d 570, 577 (Tex.App.—Houston [1st Dist.] 1996, writ denied). "The conveyance of land for a public purpose will ordinarily vest in the grantee the same rights as though the land had been acquired by condemnation proceedings." *State v. Brewer*, 141 Tex. 1, 169 S.W.2d 468, 471 (1943); *see Petty Motor Co.*, 327 U.S. at 374, 66 S.Ct. 596; *Ervay, Inc.*, 373 S.W.2d at 383. Indeed, "whenever the owner accepts a sum of money as compensation for land for such a use, his property, to the extent of the taking, is expropriated to the use of the public." *Howard v. Nolan County*, 319 S.W.2d 947, 950 (Tex.Civ.App.—Eastland 1959, no writ). The court explained the process:

> The Howards sold their land to the State for highway purposes. They thereby consented to the taking of their land for public use. They executed and delivered their deeds thereto, evidencing an immediate intention to appropriate or devote the land to the use of the public. They accepted an agreed compensation for the taking and use. The deed was accepted by the State and the appropriation became complete.

*Id.*

▆▆▆ Weingarten insists, however, that no "taking" took place in this situation because, although title was transferred to TxDOT, Weingarten did not part with possession of the property due to the leaseback arrangement. Whether there has been a "taking" is a question of law, not of fact. *See DuPuy*, 396 S.W.2d at 110; *Harris County v. Felts*, 881 S.W.2d 866, 869 (Tex.App.—Houston [14th Dist.] 1994), *aff'd*, 915 S.W.2d 482 (Tex.1996); *Waddy v. City of Houston*, 834 S.W.2d 97, 102 (Tex.App.—Houston [1st Dist.] 1992, writ denied); *Woodson Lumber Co.*, 752 S.W.2d at 747. An announcement of impending condemnation proceedings does not alone constitute a taking, where the government has imposed no current, direct restriction on the property's use. *See Gully v. Southwestern Bell Tel. Co.*, 774 F.2d 1287, 1292 n. 12 (5th Cir.1985) (applying Texas law); *Westgate, Ltd.*, 843 S.W.2d at 452; *City of Houston v. Biggers*, 380 S.W.2d 700, 704 (Tex.Civ.App.—Houston 1964, writ ref'd n.r.e.), *cert. denied*, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965).

▆▆▆ When statutory condemnation procedures are utilized, a "taking" occurs when the condemnor takes actual possession of the property or takes constructive possession by depositing the special commissioners' award in the registry of the court. *See Hooks v. Fourth Ct. of Apps.*, 808 S.W.2d 56, 60–61 (Tex.1991); *City of*

*Fort Worth v. Corbin,* 504 S.W.2d 828, 830 (Tex.1974); *Loumparoff v. Housing Auth. of City of Dallas,* 261 S.W.2d 224, 227 (Tex.Civ.App.—Dallas 1953, no writ). A similar rule prevails in cases brought under federal condemnation statutes. Upon the payment of the award, a "taking" occurs, without regard to whether the government takes actual possession of the property. *See Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10–12, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984); *United States v. Dow,* 357 U.S. 17, 22–23, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958).

 When property is acquired by agreement and there is no commissioners' award, a "taking" occurs when payment is made and accepted by the landowner and/or title is transferred to the governmental authority. *See Howard,* 319 S.W.2d at 950; *see also Yee,* 503 U.S. at 522, 112 S.Ct. 1522. "When [the landowner] accepts as compensation a sum of money, whatever the amount, and in whatever manner arrived at, his property, to the extent of the taking, is expropriated and appropriated to the use of the public." *City of San Antonio v. Grandjean,* 91 Tex. 430, 41 S.W. 477, 479 (1897); *accord Dorsett v. State,* 422 S.W.2d 828, 831 (Tex.Civ. App.—Waco 1967, writ ref'd n.r.e.). In fact, a "taking" occurs even if the property is not formally conveyed. *See Grandjean,* 41 S.W. at 479; *Dorsett,* 422 S.W.2d at 831. Once compensation has been paid to the property owner, "[t]he state's right is to take or accept without a conveyance, and hence, when the compensation is adjusted, no conveyance is necessary." *Grandjean,* 41 S.W. at 479. The conclusive effect of the State's payment of compensation arises from the inherent authority of the sovereign to take property for public use upon the payment of just compensation. The Texas Supreme Court explained this concept over a century ago, and it remains the law of Texas today:

> [T]he true principle is that, since the state has the inherent and paramount right to the property when needed for public purposes, the determination by the proper authority that the necessity

for the taking exists, and the taking, and the adjustment with the owner of the question of compensation, however effected, complete the appropriation, and devote the property to the public use. The conditional paramount title of the government becomes absolute when the compensation is assessed or agreed upon and paid, or when its payment is waived.

*Id.; accord Dorsett,* 422 S.W.2d at 831.

 The acquisition of title is also determinative. A legal right to compensation arises "when a condemnor acquires title to the whole or a part of the owner's 'property.'" *Schmidt,* 805 S.W.2d at 29. When the government actually takes title to property, the Takings Clause generally requires compensation. *See Yee,* 503 U.S. at 519, 112 S.Ct. 1522. At that point, "governmental action 'immediately and drastically diminishes the value of the [property owner's] interest.'" *City of Grand Prairie v. Sisters of the Holy Family of Nazareth,* 868 S.W.2d 835, 846 (Tex. App.—Dallas 1993, writ denied), *cert. denied,* 513 U.S. 929, 115 S.Ct. 319, 130 L.Ed.2d 280 (1994) (quoting *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 798, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983)). Title vests the titleholder with an existing right of possession. *See Hall & Edwards,* 222 S.W. 167, 169 (Tex. Comm'n App. 1920). "The right of possession is an incident to, and grows out of, the title." *Id.* "[A] landowner could be injured by a condemnor's right to possess the property, even if that right were never actually exercised." *Hooks,* 808 S.W.2d at 61.

 Stated differently, "a 'taking' is an actual physical invasion or an appropriation of the property." *Murray v. Devco, Ltd.,* 731 S.W.2d 555, 557 (Tex.1987); *see Harris County Flood Control Dist.,* 933 S.W.2d at 577. An appropriation of real property occurs upon the transfer of title. "Appropriate" has been defined by the Texas Legislature to mean:

> (A) to bring about a transfer or purported transfer of title to or other non-

possessory interest in property, whether to the actor or another; or

(B) to acquire or otherwise exercise control over property other than real property.

TEX.PEN.CODE ANN. § 31.01(4). Upon the passage of title to the State, the property at issue is appropriated, and the "taking" is effectuated.

■ In the instant case, the record reflects that on August 26, 1997, the conditions of the escrow were fulfilled, Weingarten accepted payment of $8,475,000.00, the deed was delivered to TxDOT, and title to a substantial portion of the common area of the Town & Country Shopping Center vested in the State of Texas. The Memorandum of Agreement states, "Until payment is made by TxDOT, title and possession of the property to be conveyed remains with you [Weingarten]." Once payment was made, however, title and the right to possession of the property vested in the State. Although the lease-back followed closely the transfer of title, it did not occur simultaneously, and Weingarten was, at least for a moment, entirely dispossessed of that portion of the common area deeded to the State. At that point in time, the "taking" was complete. In fact, in Texas, "upon performance of the conditions upon which a deed has been placed in escrow and the delivery of the deed, the title acquired relates back to the date when the deed was placed in the escrow." *Fuqua v. Fuqua*, 528 S.W.2d 896, 898 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.).

The subsequent lease-back did not restore the status quo. Rather than having a fee simple interest in the entire shopping center, Weingarten's interest in almost half the common area was limited to a lease of at most four years, terminable upon twelve months' written notice. Weingarten had no right to possession except as granted in the lease. Under the Lease Agreement, Weingarten was obligated to pay rent to TxDOT, to continue to sublease to retail tenants in the shopping center (despite the fact that no sublease could be for more than four years and would automatically terminate upon the termination of the master lease), and to indemnify and defend TxDOT for any claims made by Weingarten's tenants as a result of the transaction. Of course, Weingarten received $8,475,000.00 in exchange for relinquishing its rights to the property. Under these circumstances, it is more than a bit disingenuous for Weingarten now to claim that no "taking" occurred. There is no indication that the State's beneficence extends to providing in excess of $8 million to a landowner without "taking" something in return.

Accordingly, the court concludes that a "taking" by a governmental authority of over twenty-five percent of the common area of the Town & Country Shopping Center occurred on August 26, 1997. As a result, Albertson's was entitled to terminate its lease with Weingarten in accordance with Section 19.02 of the Lease Contract, and Weingarten's breach of contract claim is without basis.

4. *Lessee's Right to Portion of Proceeds*

■ "It is well settled that a leasehold is property, and the lessee is entitled to compensation when all or a part of the property leased is taken or damaged by eminent domain during the term of the lease." *Texas Pig Stands, Inc. v. Krueger*, 441 S.W.2d 940, 944 (Tex.Civ.App.—San Antonio 1969, writ ref'd n.r.e.) (citing *Urban Renewal Agency v. Trammel*, 407 S.W.2d 773, 774 (Tex.1966)). The term "owner" as used in statutes governing eminent domain includes not only the owner of the fee, but also a lessee for years as well as any other person who has an interest in the property. *See Elliott v. Joseph*, 163 Tex. 71, 351 S.W.2d 879, 884 (1961); *Marburger v. Seminole Pipeline Co.*, 957 S.W.2d 82, 90 n. 13 (Tex.App.—Houston [14th Dist.] 1997, writ denied); *Colley v. Carleton*, 571 S.W.2d 572, 573 (Tex.Civ. App.—Corpus Christi 1978, no writ). Thus, in the event of a taking, both the lessor and lessee for years are entitled to share in the award according to their re-

spective interests. *See Urban Renewal Agency*, 407 S.W.2d at 774; *accord Petty Motor Co.*, 327 U.S. at 374, 66 S.Ct. 596; *Elliott*, 351 S.W.2d at 884; *Marburger*, 957 S.W.2d at 90 n. 13; *Texaco Ref. & Mktg., Inc. v. Crown Plaza Group*, 845 S.W.2d 340, 342 (Tex.App.—Houston [1st Dist.] 1992, no writ); *O'Neil Corp. v. Perry Gas Transmission, Inc.*, 648 S.W.2d 335, 343 (Tex.App.—Amarillo 1983, writ ref'd n.r.e.); *Zinsmeyer v. State*, 646 S.W.2d 626, 628 (Tex.App.—San Antonio 1983, no writ); *Colley*, 571 S.W.2d at 573; *Board of Regents v. Fischer*, 498 S.W.2d 230, 231–32 (Tex.Civ.App.—Austin 1973, writ ref'd n.r.e.). Specifically, compensation is due the lessor for damages to its reversionary interest and to the lessee for damages to its leasehold. *See Urban Renewal Agency*, 407 S.W.2d at 777; *Colley*, 571 S.W.2d at 574. A lessee's right to share a condemnation award with the owner exists as a matter of law. *See Texaco Ref. & Mktg., Inc.*, 845 S.W.2d at 342 (citing *Urban Renewal Agency*, 407 S.W.2d at 774).

▮▮▮▮ "In condemnation proceedings where the property sought is subject to a lease, the judge or jury first determines the market value of the entire property as though it belonged to one person. Then the fact finder apportions the market value as between the lessee and the owner of the fee." *Urban Renewal Agency*, 407 S.W.2d at 774; *see Zinsmeyer*, 646 S.W.2d at 628; *Colley*, 571 S.W.2d at 574. As the court explained in *Colley*:

> In this connection, the lessee has the burden to show the amount of the damages attributable to his leasehold interest, if any. Special instructions should be submitted by the trial court to describe the lessee's interest. The balance of the damages, if any, would belong to the reversionary interest of the landowners. Once the lessee has introduced evidence of damages to the leasehold estate the landowners had the burden to go forward with evidence to refute the lessee's prima facie proof.

*Id.* (citations omitted). When a lessee has an option to extend the lease, "the term of the leasehold for the purpose of determining the extent of the taking must be considered to be its longest limit." *Petty Motor Co.*, 327 U.S. at 375, 66 S.Ct. 596. In addition, when the lessee has placed improvements on the property, which remain the property of the lessee, the lessee is entitled to that part of the condemnation award that is attributable to the market value of the improvements, without regard to any depreciation that may have been taken. *See Fischer*, 498 S.W.2d at 232; *Texas Pig Stands, Inc.*, 441 S.W.2d at 944–46; *Ervay, Inc.*, 373 S.W.2d at 385–86. Therefore, a lessee that has erected improvements on the property is "entitled to receive compensation for the difference, if any, between the market rental and the contract rental for the balance of said term. It [is] also entitled to be compensated for its ownership of the improvements which were taken by State." *Texas Pig Stands, Inc.*, 441 S.W.2d at 945.

▮▮▮▮ Therefore, contrary to Weingarten's assertions, Albertson's is entitled to recover for the value of its leasehold interest plus the value of any improvements it placed on the premises. Even with the lease-back in place, Albertson's was adversely affected by TxDOT's acquisition of almost half of the common area of the shopping center. Before the condemnation, Albertson's lease, including its interest in the condemned portion of the common area, was set to expire in 2004, with an option to extend for three additional five-year terms. After the transaction between Weingarten and TxDOT, its interest was necessarily reduced by the term of the lease-back to at most a four-year term, expiring in 2001, which could be canceled upon twelve months' notice. Hence, Albertson's had no assurance that the parking area for its store would not be eliminated within a year. In addition, Albertson's was adversely impacted with respect to the improvements it had made to the leasehold. According to the affidavit of Tony Roark, Albertson's Manager of Property Accounting, the leasehold improvements had a cost basis of $72,112.00,

with a remaining book value of $40,899.85. Albertson's was also hampered in planning for the future of its business at that location, including its ability to make decisions regarding capital expenditures and other improvements. While damages in condemnation proceedings are limited to damages to property, "it is not necessary that such damages are to be measured by the extent of the injury to the physical property itself." *City of La Grange v. Pieratt,* 142 Tex. 23, 175 S.W.2d 243, 245–46 (1943). "A right of recovery is established by proof of injury to some right of property, and the damages are measured by the extent of the injury to that right." *Id.* at 246 (citing *Hart Bros. v. Dallas County,* 279 S.W. 1111, 1112 (Tex. Comm'n App. 1926)); *see Kirschke v. City of Houston,* 330 S.W.2d 629, 632 (Tex.Civ.App.—Houston 1959, writ ref'd n.r.e.), *appeal dismissed,* 364 U.S. 474, 81 S.Ct. 242, 5 L.Ed.2d 221 (1960).

Because Weingarten chose to negotiate a sale of its property to TxDOT, rather than participate in a condemnation proceeding to which Albertson's would have been a party, Weingarten foreclosed, or at least impeded, Albertson's ability to obtain compensation from the State for the value of its leasehold. Unlike in some cases, Albertson's did not waive its right to compensation in the Lease Contract. *See Petty Motor Co.,* 327 U.S. at 376, 66 S.Ct. 596; *Texaco Ref. & Mktg., Inc.,* 845 S.W.2d at 342; *Ervay, Inc.,* 373 S.W.2d at 385–86. Instead, Section 19.03 of the Lease Contract expressly contemplates "[s]eparate awards for damages to the respective interests of Landlord and Tenant." Weingarten, however, by engaging in a negotiated sale, deprived Albertson's of the opportunity to obtain such an award, while retaining for itself the value of Albertson's leasehold interest and the improvements thereto.

■■■■■ The Settlement Agreement reflects that the State agreed to pay Weingarten $8,475,000.00 for fee title to the property, "including damages to the remainder and the interests of all of the present leasing tenants who have not previously executed and delivered to the State, Quit Claim Deeds of their leasehold interests to the State." Although the Settlement Agreement indicates that the "approved value" of the property was only $8,050,000.00, the State agreed to pay the larger sum "in order to be able to clear title to all remaining leasehold interests." In its response to Weingarten's motion for summary judgment, Albertson's concedes that it "does not contest the amount of the compensation provided by TxDOT for the whole property interest." Because the State paid the titleholder the full value for the property at issue, Alberton's would appear to have no right to proceed against TxDOT. Condemnation proceedings are *in rem,* and compensation is paid for the value of the rights taken. *See Petty Motor Co.,* 327 U.S. at 375, 66 S.Ct. 596. "[T]he statutes relating to eminent domain comprehend compensation for damage to property rather than for damage to persons." *Frankfurt v. Texas Turnpike Auth.,* 311 S.W.2d 261, 267 (Tex.Civ.App.—Texarkana, no writ).

■■■■■ Thus, as long as the State has paid the landowner just compensation for the property taken, the apportionment of the payment between the lessor and the lessee "is of no concern to the condemner." *Texas Pig Stands, Inc.,* 441 S.W.2d at 945; *see Brazos River Auth. v. Gilliam,* 429 S.W.2d 949, 952 (Tex.Civ.App.—Fort Worth 1968, writ ref'd n.r.e.); *see also City of Houston v. Culmore,* 154 Tex. 376, 278 S.W.2d 825, 826 (1955); *Harrell v. County of La Salle,* 348 S.W.2d 853, 854 (Tex.Civ. App.—Eastland 1961, writ ref'd n.r.e.). The condemnor "must pay the value of what it received in any event." *Brazos River Auth.,* 429 S.W.2d at 952. "The rule is settled that the condemnor has no interest in the apportionment of the damages between various claimants." *Fort Worth & D.S.P. Ry. Co. v. Judd,* 4 S.W.2d 1032, 1035 (Tex.Civ.App.—Amarillo 1928, writ dism'd w.o.j.). As the court observed in *Frankfurt:*

"The well-established general rules of eminent domain seem to be that, when a piece of property is taken, in which the ownership is divided into several interests, as between the public and owners, it is considered one estate; that the public right is exercised upon the land itself without regard to the subdivisions of interest; that the amount of the value of the land to which each one of the owners of the interest is entitled is no concern of the condemnor; that the various owners' interests in the property are transferred to the fund, allowed as damages to compensate them for the injury to the land, which is substituted for the property taken; that the value of the property taken is all that the condemnor must pay, and this value cannot be increased by any contracts or distribution among the different persons owning interests in it; and that the sum of all the parts can not exceed the whole."

311 S.W.2d at 267 (quoting *City of St. Louis v. Rossi*, 333 Mo. 1092, 64 S.W.2d 600, 604–05 (1933)).

Rather, Albertson's may look to Weingarten for compensation. *See Texaco Ref. & Mktg., Inc.*, 845 S.W.2d at 342; *Texas Pig Stands, Inc.*, 441 S.W.2d at 944–45. The Lease Contract expressly provides for "[s]eparate awards for damages to the respective interests of Landlord and Tenant" and states that "Tenant shall be entitled to a portion of any award to Landlord for improvements comprising the Leased Premises taken in such amount as necessary to enable Tenant to recover any unrecovered amount of its certified cost and accrued interest on the new addition added by Tenant." Weingarten recognized its obligation to satisfy any demands of the tenants *vis-a-vis* the State when it agreed to indemnify TxDOT "FROM ANY AND ALL CLAIMS THAT MAY BE MADE AGAINST THE STATE FROM ANY AND ALL LEASEHOLD TENANTS OF WEINGARTEN." Nevertheless, the amount of Albertson's damages, if any, is a question of fact for the jury that cannot be determined on summary judgment. *See Colley*, 571 S.W.2d at 576; *see also Urban*

*Renewal Agency*, 407 S.W.2d at 774. Therefore, Albertson's may proceed to trial on its counterclaim for breach of contract.

### C. *Civil Rights Claims*

Albertson's also asserts counterclaims alleging that Weingarten and TxDOT conspired to violate its civil rights. Specifically, Albertson's claims violations of various federal civil rights statutes, including 42 U.S.C. §§ 1981, 1982, 1983, 1985, and 3601–3619. Albertson's maintains that as a result of this purported conspiracy, it was deprived of its rightful share of the eminent domain proceeds for the common area of the shopping center.

#### 1. *Claims under 42 U.S.C. §§ 1981, 1982, and 3601–3619*

■■■■ Albertson's maintains that Weingarten's actions violated the Civil Rights Act of 1866, 42 U.S.C. §§ 1981–1982, as well as the Fair Housing Act, 42 U.S.C. §§ 3601–3619. Section 1981 provides, in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. Section 1981 prohibits racial discrimination, both public and private, in the making or enforcement of contracts. *See Runyon v. McCrary*, 427 U.S. 160, 168, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Tillman v. Wheaton–Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 439–40, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 441–43, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). "'The legislative history of the 1866 Act clearly indi-

cates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality.'" *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 384, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (quoting *Georgia v. Rachel,* 384 U.S. 780, 791, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966)). In order to establish a claim under § 1981, it must be shown that "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (*i.e.,* make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1087 (2d Cir. 1993); *see Green v. State Bar of Tex.,* 27 F.3d 1083, 1086 (5th Cir.1994) (citing *Mian,* 7 F.3d at 1087). Liability cannot be imposed under § 1981 absent proof of purposeful discrimination. *See General Bldg. Contractors Ass'n, Inc.,* 458 U.S. at 390, 102 S.Ct. 3141; *Gay v. Waiters' & Dairy Lunchmen's Union,* 694 F.2d 531, 536 (9th Cir.1982).

■ Section 1982, a companion statute to § 1981, provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982. Section 1982 bars all racial discrimination, private as well as public, in the sale and rental of property. *See Jones,* 392 U.S. at 413, 88 S.Ct. 2186. "The operative language of both laws apparently originated in § 1 of the Civil Rights Act of 1866, 14 Stat. 27, enacted by Congress shortly after ratification of the Thirteenth Amendment." *General Bldg. Contractors Ass'n, Inc.,* 458 U.S. at 384, 102 S.Ct. 3141. Thus, both §§ 1981 and 1982 were enacted to address racial discrimination. *See Jones,* 392 U.S. at 436, 88 S.Ct. 2186.

■ The Fair Housing Act states, in relevant part:

It shall be unlawful—

a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental·of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604. The Fair Housing Act broadens the scope of prohibited discrimination to race, color, religion, sex, familial status, national origin, and handicap. Under the Fair Housing Act, a plaintiff need not prove discriminatory intent; rather, significant discriminatory effect will suffice. *See Hanson v. Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir.1986); *Woods–Drake v. Lundy,* 667 F.2d 1198, 1202 (5th Cir.1982).

■ In this situation, there is no evidence to support a finding of a violation of § 1981, 1982, or 3604. Specifically, Albertson's has not established, nor does it allege, that it is a member of a protected class or that Weingarten's actions discriminated against that class. Furthermore, on its face, the Fair Housing Act extends only to dwellings, *i.e.,* residential property, not to commercial real estate, as in dispute in this case. Consequently, Albertson's claims based on these statutes must be rejected.

### 2. Civil Conspiracy Claim under 42 U.S.C. § 1985

Albertson's claims that Weingarten conspired with TxDOT to violate its federally protected right not to be deprived of property without due process of law. A person injured as the result of a conspiracy to interfere with his civil rights may bring an action under 42 U.S.C. § 1985. Subsection 1 relates to a conspiracy to prevent a

public official from performing his duty; Subsection 2 addresses a conspiracy to obstruct justice or to intimidate a party, a witness, or a juror; and Subsection 3 concerns the acts of two or more persons conspiring to deprive any person of certain civil rights. *See Holdiness v. Stroud,* 808 F.2d 417, 424 (5th Cir.1987). Although Albertson's does not specify the subsection upon which it relies, it appears to be attempting to invoke Subsection 3. Section 1985(3) provides, in pertinent part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

■■■ Section 1985(3) creates no rights, but "is a purely remedial statute, providing a civil cause of action when some otherwise defined federal right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section." *Great Am. Fed. S & L Ass'n v. Novotny,* 442 U.S. 366, 376, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). To recover under § 1985(3), the plaintiff must allege and prove four elements: (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or

deprived of any right or privilege of a citizen of the United States. *See United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Hilliard v. Ferguson,* 30 F.3d 649, 652–53 (5th Cir.1994); *Deubert v. Gulf Fed. Sav. Bank,* 820 F.2d 754, 757 (5th Cir.1987); *see also Mian,* 7 F.3d at 1087. In addition, the conspiracy must be motivated by " 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' " *United Bhd. of Carpenters & Joiners,* 463 U.S. at 829, 103 S.Ct. 3352 (quoting *Griffin,* 403 U.S. at 102, 91 S.Ct. 1790); *see Hilliard,* 30 F.3d at 653 (citing *Burns–Toole v. Byrne,* 11 F.3d 1270, 1276 (5th Cir.), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2680, 129 L.Ed.2d 814 (1994)); *Mississippi Women's Med. Clinic v. McMillan,* 866 F.2d 788, 793 (5th Cir.1989).

■■■ The Supreme Court has cautioned against the application of § 1985 to commercial disputes:

> [G]roup actions generally resting on economic motivations should be deemed beyond the reach of § 1985(3). Economic and commercial conflicts ... are best dealt with by statutes, federal or state, specifically addressed to such problems, as well as by the general law proscribing injuries to persons and property.

*United Bhd. of Carpenters & Joiners,* 463 U.S. at 839, 103 S.Ct. 3352. The Supreme Court has also suggested that actionable § 1985(3) claims may be limited to race-based conspiracies. *See McLean v. International Harvester Co.,* 817 F.2d 1214, 1218 (5th Cir.1987) (citing *United Bhd. of Carpenters & Joiners,* 463 U.S. at 836, 103 S.Ct. 3352). "[I]t is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause." *United Bhd. of Carpenters & Joiners,* 463 U.S. at 836, 103 S.Ct. 3352. The Fifth Circuit has noted this limitation:

"[S]ection 1985(3) will not be extended to every class which the artful pleader can contrive.... We remain mindful ... of the Supreme Court's evident concern in *Griffin* over the broad literal sweep of the statute. That concern dictates the exercise of restraint when a court is confronted with class-based discrimination grounded in a non-racial animus."

*McLean,* 817 F.2d at 1219 (quoting *McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919, 928–29 (5th Cir.1977)). In *McLean,* the Fifth Circuit further commented that since *McLellan,* the court has limited § 1985(3) protection to two types of cases: "1) those characterized by some inherited or immutable characteristic; and 2) those characterized by political beliefs or associations." *Id.* Albertson's does not meet the Fifth Circuit's test for a discrete, insular class of individuals possessing "inherited or immutable characteristics," such as race, national origin, or sex, nor does it allege that Weingarten's actions were politically motivated. *See id.* (citing *Murphy v. Mount Carmel High Sch.,* 543 F.2d 1189, 1192 n. 1 (7th Cir.1976)). Hence, due to its failure to show or even allege a viable class-based or political animus, Albertson's § 1985(3) claim must fail.

### 3. *Claims under 42 U.S.C. § 1983*

■■ The Civil Rights Act of 1871, 42 U.S.C. § 1983, creates a private right of action for redressing the violation of federal law by those acting under color of state law. *See Migra v. Board of Educ.,* 465 U.S. 75, 82, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 19, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Texas Manufactured Hous. Ass'n, Inc. v. City of Nederland,* 101 F.3d 1095, 1106 (5th Cir.1996), *cert. denied,* 521 U.S. 1112, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997); *McIntosh v. Antonino,* 71 F.3d 29, 33 (1st Cir.1995). It provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)); *accord Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Jackson v. City of Atlanta,* 73 F.3d 60, 63 (5th Cir.), *cert. denied,* 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996); *Young v. City of Killeen,* 775 F.2d 1349, 1352 (5th Cir.1985); *Carbonell v. Louisiana Dep't of Health & Human Resources,* 772 F.2d 185, 188 (5th Cir.1985).

■■ To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived it of a right secured by the Constitution or laws of the United States. *See Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997); *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Augustine v. Doe,* 740 F.2d 322, 324–25 (5th Cir.1984). A § 1983 complainant must support its claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *See Schultea v. Wood,* 47 F.3d 1427, 1433 (5th Cir. 1995); *Fee v. Herndon,* 900 F.2d 804, 807 (5th Cir.), *cert. denied,* 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990); *Jacquez v. Procunier,* 801 F.2d 789, 793 (5th Cir. 1986); *Angel v. City of Fairfield,* 793 F.2d 737, 739 (5th Cir.1986); *Elliott v. Perez,* 751 F.2d 1472, 1482 (5th Cir.1985).

■ Thus, for Albertson's to recover, it must show that Weingarten deprived

it of a right guaranteed by the Constitution or the laws of the United States. *See Daniels*, 474 U.S. at 329–31, 106 S.Ct. 662; *Baker*, 443 U.S. at 139, 99 S.Ct. 2689; *Thomas v. Sams*, 734 F.2d 185, 190–91 (5th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). Albertson's must also prove that the alleged constitutional or statutory deprivation was intentional or due to deliberate indifference—not the result of mere negligence. *See Farmer v. Brennan*, 511 U.S. 825, 828–29, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels*, 474 U.S. at 328, 106 S.Ct. 662; *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The negligent deprivation of life, liberty, or property is not a constitutional violation. *See Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir.1995); *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir.), *cert. denied*, 506 U.S. 973, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992); *Herrera v. Millsap*, 862 F.2d 1157, 1160 (5th Cir. 1989); *Simmons v. McElveen*, 846 F.2d 337, 339 (5th Cir.1988); *Young*, 775 F.2d at 1353. Moreover, to hold a defendant liable under § 1983, a plaintiff must adduce facts demonstrating a defendant's participation in the alleged wrong. *See Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir.1992); *Jacquez*, 801 F.2d at 793.

 "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). The Supreme Court has formulated a two-part approach to the issue of state action:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Due to the lack of state action, private persons generally may not be held liable under § 1983. *See Richardson v. Fleming*, 651 F.2d 366, 371 (5th Cir.1981).

 Under certain circumstances, however, a conspiracy theory may be utilized to establish that a private defendant acted under color of state law within the meaning of § 1983. *See Brummett v. Camble*, 946 F.2d 1178, 1185 (5th Cir.1991), *cert. denied*, 504 U.S. 965, 112 S.Ct. 2323, 119 L.Ed.2d 241 (1992) (citing *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Winter*, 782 F.2d 508, 512 (5th Cir.1986)). Through showing that a private defendant conspired with public officials, the requisite state action may be demonstrated. *See Turner v. Upton County*, 915 F.2d 133, 137 n. 6 (5th Cir. 1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991); *Villanueva v. McInnis*, 723 F.2d 414, 418 (5th Cir.1984). The United States Supreme Court has explained:

a private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983. "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents...."

*Adickes,* 398 U.S. at 152, 90 S.Ct. 1598 (quoting *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)); *see Cinel v. Connick,* 15 F.3d 1338, 1343 (5th Cir.), *cert. denied,* 513 U.S. 868, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994); *McCartney v. First City Bank,* 970 F.2d 45, 47 (5th Cir.1992); *Sims v. Jefferson Downs Racing Ass'n, Inc.,* 778 F.2d 1068, 1076 (5th Cir.1985). Liability may be imposed even if the private defendant is alleged to have conspired with an official who has absolute immunity. *See Brummett,* 946 F.2d at 1185 (citing *Dennis,* 449 U.S. at 27, 101 S.Ct. 183; *Turner,* 915 F.2d at 137). A private person who conspires with a person acting under color of state law, even though the latter party may be immune from liability, may be held liable in damages for his participation in the conspiracy. *See Dennis,* 449 U.S. at 27, 101 S.Ct. 183. Thus, "[u]nder § 1983 conspiracy can furnish the conceptual spring for imputing liability from one to another." *Farrar v. Cain,* 756 F.2d 1148, 1151 (5th Cir.1985); *see Villanueva,* 723 F.2d at 418.

■ In response to Weingarten's motion for summary judgment, Albertson's asserts that "Weingarten, through its various personnel ... combined with TxDOT ... to negotiate and enter an agreement that awarded Weingarten compensation for the full fee simple interest in the property damaged by the taking." Albertson's further alleges that "Weingarten conspired and contracted to receive the full amount of compensation for the damages to the remainder, including any apportionment for its tenants' interests." Albertson's also asserts that "Weingarten, by conspiring and contracting with TxDOT to receive the whole of the compensable interest for the taking of the condemned portion and the damage to the remainder, deprived Albertson's and other tenants of their right to assert their property interests and entitlement to an award on the basis of the condemnation." Yet, Albertson's has not supported its claims with sufficient evidence to establish an actionable conspiracy under § 1983.

■ To prevail on a § 1983 conspiracy claim, the plaintiff must show "1) an agreement between the private and public defendants to commit an illegal act, and 2) an actual deprivation of constitutional rights." *Cinel,* 15 F.3d at 1343 (citing *Arsenaux v. Roberts,* 726 F.2d 1022, 1024 (5th Cir.1982); *Villanueva,* 723 F.2d at 418). " 'Mere conclusory allegations of conspiracy cannot, absent reference to material facts,' constitute grounds for § 1983 relief." *Dayse v. Schuldt,* 894 F.2d 170, 173 (5th Cir.1990) (quoting *Arsenaux,* 726 F.2d at 1024); *see Russell v. Millsap,* 781 F.2d 381, 383 (5th Cir.1985), *cert. denied,* 479 U.S. 826, 107 S.Ct. 103, 93. L.Ed.2d 53 (1986). Here, Albertson's has failed to adduce any evidence that Weingarten agreed with TxDOT to commit an illegal act. As discussed above, the failure of TxDOT to apportion the payment between Weingarten and Albertson's was not *per se* an unlawful act. Texas precedent indicates that a condemnor's obligation may be satisfied through a lump sum payment for the property, leaving the claimants later to divide the proceeds among themselves. *See Culmore,* 278 S.W.2d at 826; *Brazos River Auth.,* 429 S.W.2d at 952; *Texas Pig Stands, Inc.,* 441 S.W.2d at 945; *Harrell,* 348 S.W.2d at 854; *Frankfurt,* 311 S.W.2d at 267; *Angier v. Balser,* 48 S.W.2d 668, 671 (Tex.Civ.App.—Austin 1932, writ ref'd); *Judd,* 4 S.W.2d at 1035; *Davidson v. Texas & N.O.R. Co.,* 29 Tex.Civ.App. 54, 67 S.W. 1093, 1095 (1902, no writ). The Settlement Agreement acknowledges that "there are several leasing tenants occupying a portion of Weingarten's property and Weingarten and such tenants of Weingarten have been unable to come to an agreement regarding what portion, if any, of the total compensation the State has agreed to pay Weingarten, should be shared by Weingarten and such leasing tenants...." The State need only pay just compensation for the value of the property taken, which Albertson's acknowledges occurred in this instance. *See Brazos River Auth.,* 429 S.W.2d at 952; *Frankfurt,* 311 S.W.2d at 267. Consequently, without a showing

that Weingarten agreed with a state actor to commit an unlawful act, Albertson's cannot prevail on its conspiracy claim under § 1983. *See Cinel,* 15 F.3d at 1343.

Thus, Albertson's has failed to adduce sufficient evidence on any of its federal civil rights claims to defeat summary judgment.

### III. *Conclusion*

Accordingly, Albertson's motion for interlocutory summary judgment is GRANTED, and Weingarten's motion for partial summary judgment is DENIED. Weingarten fails to present a claim that would entitle it to relief. There remain no material facts in dispute on Weingarten's breach of contract claim, and Albertson's is entitled to judgment as a matter of law.

Weingarten's motion for summary judgment is GRANTED with respect to Albertson's federal civil rights claims under 42 U.S.C. §§ 1981, 1982, 1983, 1985, and 3601–3619. As to these claims, Albertson's has presented no triable issues of fact, and they fail as a matter of law.

Weingarten's motion for summary judgment is DENIED with respect to Albertson's breach of contract claims, as they present unresolved, material issues of fact. Albertson's may proceed to trial on its claims to recover damages for the value of its leasehold and for improvements made to the leased premises.